# FEDERAL TRADE COMMISSION *v.* SIMPLICITY PATTERN CO., INC.

No. 406.   Argued April 21, 1959.—Decided June 8, 1959.*

*Charles H. Weston* argued the causes for the Federal Trade Commission.   With him on the briefs were *Solicitor General Rankin, Assistant Attorney General Hansen, Earl W. Kintner* and *James E. Corkey.*

*William Simon* argued the causes for the Simplicity Pattern Co., Inc.   With him on the briefs were *Robert L. Wald, David Vorhaus* and *Sidney Greenman.*

---

*Together with No. 447, *Simplicity Pattern Co., Inc.,* v. *Federal Trade Commission,* also on certiorari to the same Court.

Mr. Justice Clark delivered the opinion of the Court.

This case presents, for the first time in this Court, issues relating to the availability of certain defenses to a prima facie violation of § 2 (e) of the Clayton Act, 38 Stat. 730, as amended by the Robinson-Patman Act, 49 Stat. 1526.[1] The Federal Trade Commission has

[1] The complaint was in two counts, the first being under the Federal Trade Commission Act. This count was dismissed. The second count, which is the only one before us, involves certain subsections of § 2 of the Clayton Act, 15 U. S. C. § 13. For ready reference we quote § 2 in its entirety:

"(a) That it shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them: *Provided,* That nothing herein contained shall prevent differentials which make only due allowance for differences in the cost of manufacture, sale, or delivery resulting from the differing methods or quantities in which such commodities are to such purchasers sold or delivered: *Provided, however,* That the Federal Trade Commission may, after due investigation and hearing to all interested parties, fix and establish quantity limits, and revise the same as it finds necessary, as to particular commodities or classes of commodities, where it finds that available purchasers in greater quantities are so few as to render differentials on account thereof unjustly discriminatory or promotive of monopoly in any line of commerce; and the foregoing shall then not be construed to permit differentials based on differences in quantities greater than those so fixed and established: *And provided further,* That nothing herein contained shall prevent persons engaged in selling goods, wares, or merchandise in commerce from selecting their own customers in bona fide transactions and not in restraint of trade: *And provided*

found that Simplicity Pattern Co., Inc., one of the Nation's largest dress pattern manufacturers, discriminated in favor of its larger customers by furnishing to them services and facilities not accorded to competing.

*further,* That nothing herein contained shall prevent price changes from time to time where in response to changing conditions affecting the market for or the marketability of the goods concerned, such as but not limited to actual or imminent deterioration of perishable goods, obsolescence of seasonal goods, distress sales under court process, or sales in good faith in discontinuance of business in the goods concerned.

"(b) Upon proof being made, at any hearing on a complaint under this section, that there has been discrimination in price or services or facilities furnished, the burden of rebutting the prima-facie case thus made by showing justification shall be upon the person charged with a violation of this section, and unless justification shall be affirmatively shown, the Commission is authorized to issue an order terminating the discrimination: *Provided, however,* That nothing herein contained shall prevent a seller rebutting the prima-facie case thus made by showing that his lower price or the furnishing of services or facilities to any purchaser or purchasers was made in good faith to meet an equally low price of a competitor, or the services or facilities furnished by a competitor.

"(c) That it shall be unlawful for any person engaged in commerce, in the course of such commerce, to pay or grant, or to receive or accept, anything of value as a commission, brokerage, or other compensation, or any allowance or discount in lieu thereof, except for services rendered in connection with the sale or purchase of goods, wares, or merchandise, either to the other party to such transaction or to an agent, representative, or other intermediary therein where such intermediary is acting in fact for or in behalf, or is subject to the direct or indirect control, of any party to such transaction other than the person by whom such compensation is so granted or paid.

"(d) That it shall be unlawful for any person engaged in commerce to pay or contract for the payment of anything of value to or for the benefit of a customer of such person in the course of such commerce as compensation or in consideration for any services or facilities furnished by or through such customer in connection with the processing, handling, sale, or offering for sale of any products or commodities manufactured, sold, or offered for sale by such person, unless such payment or consideration is available on proportionally

smaller customers on proportionally equal terms. The Commission held that neither the presence of "cost justification" nor the absence of competitive injury may constitute a defense to a § 2 (e) violation.

The Court of Appeals found that competition existed between the larger and smaller customers of Simplicity and, with one judge dissenting, held that an absence of competitive injury would not constitute a "justification" rebutting a prima facie showing of a § 2 (e) violation. Through a different majority,[2] however, it remanded the case on the "cost justification" defense under § 2 (b), holding that Simplicity might rebut the prima facie case by showing that the discriminations in services and facilities were justified by differences in Simplicity's costs in dealing with the two classes of customers. 103 U. S. App. D. C. 373, 258 F. 2d 673. The Commission, in No. 406, and Simplicity, in No. 447, filed cross-petitions for certiorari which we consider together. We granted both petitions because of the fundamental significance of these issues in the application of an important Act of Congress. 358 U. S. 897. We have concluded that, given competition between the two classes of customers, neither absence of competitive injury nor the presence of "cost justification"

---

equal terms to all other customers competing in the distribution of such products or commodities.

"(e) That it shall be unlawful for any person to discriminate in favor of one purchaser against another purchaser or purchasers of a commodity bought for resale, with or without processing, by contracting to furnish or furnishing, or by contributing to the furnishing of, any services or facilities connected with the processing, handling, sale, or offering for sale of such commodity so purchased upon terms not accorded to all purchasers on proportionally equal terms.

"(f) That it shall be unlawful for any person engaged in commerce, in the course of such commerce, knowingly to induce or receive a discrimination in price which is prohibited by this section."

[2] Judge Washington dissented on the "cost-justification" issue, while Judge Burger was in dissent on the competitive injury question.

defeats enforcement of the provisions of § 2 (e) of the Act. The action of the Commission in issuing the cease-and-desist order is, therefore, affirmed.

Simplicity manufactures and sells tissue patterns which are used in the home for making women's and children's wearing apparel. Its volume of pattern sales, in terms of sales units, is greater than that resulting from the combined effort of all other major producers.[3] The patterns are sold to some 12,300 retailers, with 17,200 outlets. For present purposes, these customers can be divided roughly into two categories. One, consisting largely of department and variety stores, comprises only 18% of the total number of customers, but accounts for 70% of the total sales volume. The remaining 82% of the customers are small stores whose primary business is the sale of yard-good fabrics.

About 600 different patterns are made available to Simplicity's customers. New patterns are added at the rate of 40 per month, while three times annually the obsolete designs are discontinued so as to maintain the number of designs at a relatively constant level. The different designs are displayed in a catalogue which is changed monthly in order to reflect the changes in available designs. The patterns themselves are stored and displayed in steel cabinets. The catalogues and storage cabinets are both furnished by Simplicity.

The variety stores handle and sell a multitude of relatively low-priced articles. Each article, including dress patterns, is sold for the purpose of returning a profit and would be dropped if it failed to do so. The fabric stores, on the other hand, are primarily interested in selling yard goods; they handle patterns at no profit or even at a loss

---

[3] In dollar volume, Simplicity's percentage-of-industry total is somewhat lower, due to the fact that its prices are among the lowest in the industry.

as an accommodation to their fabric customers and for the purpose of stimulating fabric sales. These differences in motive are reflected in the manner in which each type of store handles its patterns. The variety stores devote the minimum amount of display space consistent with adequate merchandising—consisting usually of nothing more than a place on the counter for the catalogues, with the patterns themselves stored underneath the counter in the steel cabinets furnished by Simplicity. In contrast, the fabric stores usually provide tables and chairs where the customers may peruse the catalogues in comfort and at their leisure.

The retail prices of Simplicity patterns are uniform at 25¢, 35¢, or 50¢. Similarly, Simplicity charges a uniform price, to all its customers, of 60% of the retail price. However, in the furnishing of certain services and facilities Simplicity does not follow this uniformity. It furnishes patterns to the variety stores on a consignment basis, requiring payment only as and when patterns are sold—thus affording them an investment-free inventory. The fabric stores are required to pay cash for their patterns in regular course. In addition, the cabinets and the catalogues are furnished to variety stores free while the fabric stores are charged therefor, the catalogues averaging from $2 to $3 each. Finally, all transportation costs in connection with its business with variety stores are paid by Simplicity but none is paid on fabric-store transactions.

The free services and facilities thus furnished variety store chains are substantial in value. As to four variety store chains, the catalogues which Simplicity furnished free in 1954 were valued at $128,904; the cabinets furnished free which those stores had on hand at the end of 1954 were valued at over $500,000; and their inventory of Simplicity's patterns at the end of 1954 was valued at

more than $1,775,000, each of these values being based on Simplicity's usual sales price. Simplicity's president testified that it would cost over $2,000,000 annually to give its other customers the free transportation, free catalogues, and free cabinets furnished to variety stores.[4]

[4] It should be noted that Simplicity has apparently acted entirely in good faith. While the services and facilities described in the body of the opinion are admittedly furnished free only to the variety stores, Simplicity asserts that other services and facilities are furnished only to the smaller customers. These claimed services include: A staff of 12 young ladies travels throughout the country giving fashion shows and sewing demonstrations in schools, 4–H Clubs and the like. These demonstrations are coordinated through the local fabric stores to assist the latter in pushing sales both of patterns and of fabrics. Large promotional posters, portraying fabrics and fashion trends, are furnished monthly to the fabric stores. "Flyers," or brochures, designed, printed and distributed by Simplicity solely for the small merchant, tell him (in the words of Simplicity's president) "what the proper sources of supply are in New York, what the trends are, how to trim his windows, how to run certain aspects of his department and a great deal of other material." A monthly publication called the "Simplicity Pattern Book" is sold through fabric stores at an annual loss to Simplicity of over $100,000. The publication is designed to "glamorize and dramatize for the consumer and for the merchant the textiles and trends throughout the country."

These services and facilities are apparently available to the variety stores, but are not used by them because of their method of doing business. Thus, Simplicity claims that the fabric stores receive services and facilities, valued by Simplicity at more than $1,000,000 annually, which in fact if not in law are not used by the variety stores. The parties did not explore, before the Commission, the possibility that this tailoring of services and facilities to meet the different needs of two classes of customers in fact constituted "proportionally equal terms." And, of course, this point was not raised in the Court of Appeals or in this Court. We note in passing, however, that the Commission has indicated a willingness to give a relatively broad scope to the standard of proportional equality under §§ 2 (d) and 2 (e). See *Lever Brothers Co.*, 50 F. T. C. 494, 512 (1953). ("[§ 2 (d)] does not prohibit a seller from paying for services of various types." A "plan providing payment for promotional

Simplicity does not dispute these findings. Assuming that the existence of competition between purchasers is a necessary element in a § 2 (e) prosecution, it insists that no real competition in patterns exists between the variety and the fabric stores. It also contends that even if competition is present its conduct may be justified by a showing that no competitive injury resulted or, alternatively, that the discriminations are not unlawful if it could be shown that the differential treatment was only reflective of the differences in its costs in dealing with the two types of customers.

## 1. EXISTENCE OF COMPETITION.

The unanimous conclusion of the Examiner, the Commission, and the Court of Appeals on this point was, as stated by the Court of Appeals, that the variety and fabric stores, "operating in the same cities and in the same shopping area, often side by side, were competitors, purchasing from Simplicity at the same price and then at like prices retailing the identical product to substantially the same segment of the public." 103 U. S. App. D. C., at 377, 258 F. 2d, at 677. Simplicity argues that "motivation" controls and that since the variety store sells for a profit and the fabric store for accommodation that the competition is minuscule. But the existence of competition does not depend on such motives. Regardless of the necessity the fabric stores find in the handling of patterns it does not remove their incentive to sell those on hand, especially when cash is tied up in keeping patterns on the

services and facilities . . . must be honest in its purpose and fair and reasonable in its application.") See also *Procter & Gamble Distributing Co.*, 50 F. T. C. 513 (1953); *Colgate-Palmolive-Peet Co.*, 50 F. T. C. 525 (1953); Report of the Attorney General's National Committee to Study the Antitrust Laws 189–190 (1955). Since the issue is not properly before us, we of course do not pass on it.

shelves. The discriminatory terms under which they are obliged to handle them increase their losses. Furthermore, Simplicity not only takes advantage of the captive nature of the fabric stores in not granting them these advantages but compounds the damage by creating a sales outlet in the variety stores through the granting of these substantial incentives to engage in the pattern business. Without such partial subsidization the variety stores might not enter into the pattern trade at all.

Nor does it follow that the failure here to show specific injury to competition in patterns is inconsistent with a finding that competition in fact exists.[5] It may be, as Simplicity argues, that the sale of patterns is minuscule in the over-all business of a variety store, but the same is true of thousands of other items. While the giving of discriminatory concessions to a variety store on any one isolated item might cause no injury to competition with a fabric store in its over-all operation, that fact does not render nonexistent the actual competition between them in patterns. It remains, and, because of the discriminatory concessions, causes further losses to the fabric store. As this Court said in *Federal Trade Comm'n* v. *Morton Salt Co.,* 334 U. S. 37, 49 (1948),

> "There are many articles in a grocery store that, considered separately, are comparatively small parts of a merchant's stock. Congress intended to protect a merchant from competitive injury attributable to discriminatory prices on any or all goods sold in interstate commerce, whether the particular goods consti-

---

[5] Simplicity argues that the Examiner "affirmatively found an absence of competitive injury." This view was apparently adopted by the Court of Appeals. 103 U. S. App. D. C., at 378, 258 F. 2d, at 678. We do not so read the record, however. What the Examiner said was that "there is *no showing* of competitive injury." (Emphasis added.)

tuted a major or minor portion of his stock. Since a grocery store consists of many comparatively small articles, there is no possible way effectively to protect a grocer from discriminatory prices except by applying the prohibitions of the Act to each individual article in the store."

## 2. APPLICATION OF THE JUSTIFICATION DEFENSES OF § 2 (b).

Simplicity contends that an absence of competitive injury constitutes a defense under the justification provisions of § 2 (b) and further that it should have been permitted, under that subsection, to dispel its discrimination in services and facilities by a showing of lower costs in its transactions with the variety stores. We agree with the Commission that the language of the Act, when considered in its entirety, will not support this construction.

Section 2 (a) makes unlawful price discriminations

"where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition . . . ."

This price discrimination provision is hedged with qualifications. An exception is made for price differentials "which make only due allowance for differences in the cost of manufacture, sale, or delivery." Care was taken that price changes are not outlawed where made in response to changing market conditions. Finally, § 2 (a) codifies the rule of *United States* v. *Colgate & Co.*, 250 U. S. 300 (1919), protecting the right of a person in commerce to select his "own customers in bona fide transactions and not in restraint of trade."

Subsections (c), (d), and (e), on the other hand, unqualifiedly make unlawful certain business practices other than price discriminations.[6] Subsection (c) applies to the payment or receipt of commissions or brokerage allowances "except for services rendered." Subsection (d) prohibits the payment by a seller to a customer for any services or facilities furnished by the latter, unless "such payment . . . is available on proportionally equal terms to all other [competing] customers." Subsection (e), which as noted is the provision applicable in this case, makes it unlawful for a seller

> "to discriminate in favor of one purchaser against another purchaser or purchasers of a commodity bought for resale . . . by . . . furnishing . . . any services or facilities connected with the processing, handling, sale, or offering for sale of such commodity so purchased upon terms not accorded to all purchasers on proportionally equal terms."

In terms, the proscriptions of these three subsections are absolute. Unlike § 2 (a), none of them requires, as proof of a prima facie violation, a showing that the illicit practice has had an injurious or destructive effect on competition.[7] Similarly, none has any built-in defensive matter, as does § 2 (a). Simplicity's contentions boil down to an argument that the exculpatory provisions which Congress has made expressly applicable only to price discriminations are somehow included as "justifications" for

---

[6] Subsection (f) is a corollary to § 2 (a), making it unlawful "knowingly to induce or receive" a price discrimination barred by the latter. See *Automatic Canteen Co. v. Federal Trade Comm'n,* 346 U. S. 61 (1953).

[7] Simplicity concedes this, in effect, but argues that it should be allowed under § 2 (b) to "justify" the § 2 (e) violation by making an affirmative showing of *absence* of competitive injury.

discriminations in services or facilities by § 2 (b),[8] which provides that

"Upon proof being made, at any hearing on a complaint under this section, that there has been discrimination in price or services or facilities furnished, the burden of rebutting the prima-facie case thus made *by showing justification* shall be upon the person charged with a violation of this section, and unless justification shall be affirmatively shown, the Commission is authorized to issue an order terminating the discrimination: *Provided, however,* That nothing herein contained shall prevent a seller rebutting the prima-facie case thus made by showing that his lower price or the furnishing of services or facilities to any purchaser or purchasers was made in good faith to meet an equally low price of a competitor, or the services or facilities furnished by a competitor." (Emphasis added.)

We hold that the key word "justification" can be read no more broadly than to allow rebuttal of the respective offenses in one of the ways expressly made available by Congress. Thus, a discrimination in prices may be rebutted by a showing under any of the § 2 (a) provisos, or under the § 2 (b) proviso[9]—all of which by their terms

---

[8] In allowing a showing of "cost-justification" under § 2 (b), the Court of Appeals negated any inference that it was thereby importing "§ 2 (a) criteria as matters of defense to a Section 2 (e) charge." Rather, it held that "the justification to be shown under the first clause of § 2 (b) as to a § 2 (e) charge of discrimination in 'facilities furnished' to various *customers,* [would] depend upon the facts in a particular case." 103 U. S. App. D. C., at 381, 258 F. 2d, at 681. (Italics in the original.) On this theory, the limits of the justification which could be shown would be established by litigation, on a case-to-case basis.

[9] See *Standard Oil Co.* v. *Federal Trade Comm'n,* 340 U. S. 231 (1951).

apply to price discriminations. On the other hand, the only escape Congress has provided for discriminations in services or facilities is the permission to meet competition as found in the § 2 (b) proviso. We cannot supply what Congress has studiously omitted.[10]

Simplicity's arguments to the contrary are based essentially on the ground that it would be "bad law and bad economics" to make discriminations unlawful even where they may be accounted for by cost differentials or where there is no competitive injury.[11] Entirely aside from the fact that this Court is not in a position to review the economic wisdom of Congress, we cannot say that the legislative decision to treat price and other dis-

---

[10] The Courts of Appeals, prior to this case, had uniformly rejected the argument that § 2 (e) violations were subject to a cost-justification defense or required a showing of adverse effect on competition. *Elizabeth Arden, Inc.,* v. *Federal Trade Comm'n,* 156 F. 2d 132 (C. A. 2d Cir. 1946) (competitive injury); *Corn Products Refining Co.* v. *Federal Trade Comm'n,* 144 F. 2d 211, 219 (C. A. 7th Cir. 1944), aff'd on other grounds 324 U. S. 726 (competitive injury); *Southgate Brokerage Co.* v. *Federal Trade Comm'n,* 150 F. 2d 607, 610 (C. A. 4th Cir. 1945) (dictum as to competitive injury); *Great Atlantic & Pacific Tea Co.* v. *Federal Trade Comm'n,* 106 F. 2d 667 (C. A. 3d Cir. 1939) (dictum as to cost-justification); *Oliver Bros., Inc.,* v. *Federal Trade Comm'n,* 102 F. 2d 763, 767 (C. A. 4th Cir. 1939) (dictum as to competitive injury). It does not appear that any Court of Appeals had previously been asked to decide whether an absence of competitive injury could constitute a "justification" under § 2 (b).

[11] Compare the Report of the Attorney General's National Committee to Study the Antitrust Laws (1955). The Committee recognized that as of that date subsections (c), (d) and (e) had been uniformly interpreted as not requiring a showing of competitive injury, and as not allowing a cost-justification defense. Pp. 187–193. It expressed disagreement with the desirability of this result, in view of what it deemed the "broader antitrust objectives," and recommended that § 2 (c) be changed by legislation and § 2 (d) and (e) by "interpretive reform." P. 193.

criminations differently is without a rational basis. In allowing a "cost justification" for price discriminations and not for others, Congress could very well have felt that sellers would be forced to confine their discriminatory practices to price differentials, where they could be more readily detected and where it would be much easier to make accurate comparisons with any alleged cost savings.[12] *Biddle Purchasing Co.* v. *Federal Trade Comm'n*, 96 F. 2d 687, 692 (C. A. 2d Cir. 1938). And, with respect to the absence of competitive injury requirements, it suffices to say that the antitrust laws are not strangers to the policy of nipping potentially destructive practices before they reach full bloom. Cf. *Klor's, Inc.,* v. *Broadway-Hale Stores,* 359 U. S. 207 (1959).[13]

Our conclusions are further confirmed by the historical setting of the Robinson-Patman amendments to § 2 of the Clayton Act. As originally worded in 1914 (38 Stat. 730), § 2 applied only to price discriminations, and then only where the effect of such discrimination was "to substantially lessen competition or tend to create a monopoly in any line of commerce." [14] Furthermore, a proviso

---

[12] During congressional debates on the bill, there were continual references to the subsection (c), (d) and (e) practices as "secret" discriminations. See, *e. g.,* 80 Cong. Rec. 8126, 8127, 8132, 8135, 8137, 8226.

[13] Compare *Northern Pacific R. Co.* v. *United States,* 356 U. S. 1 (1958); *United States* v. *Socony-Vacuum Oil Co.,* 310 U. S. 150 (1940), which contain examples of *per se* violations under the Sherman Act. It is not without significance that earlier versions of both the House and Senate bills would have outlawed even *price* discriminations without regard to their effect upon competition. H. R. 8442, 74th Cong., 1st Sess.; S. 3154, 74th Cong., 1st Sess.

[14] This language was retained in § 2 (a) under the Robinson-Patman Act amendment, and the following was added, "or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them."

excepted price discriminations based on "differences in the . . . quantity of the commodity sold," regardless of whether the differences in quantity resulted in corresponding cost differentials.

A lengthy investigation conducted in the 1930's by the Federal Trade Commission disclosed that several large chain buyers were effectively avoiding § 2 by taking advantage of gaps in its coverage. Because of their enormous purchasing power, these chains were able to exact price concessions, based on differences in quantity, which far exceeded any related cost savings to the seller. Consequently, the seller was forced to raise prices even further on smaller quantity lots in order to cover the concessions made to the large purchasers. Comparable competitive advantages were obtained by the large purchasers in several ways other than direct price concessions. Rebates were induced for "brokerage fees," even though no brokerage services had been performed. "Advertising allowances" were paid by the sellers to the large buyers in return for certain promotional services undertaken by the latter. Some sellers furnished special services or facilities to the chain buyers. Lacking the purchasing power to demand comparable advantages, the small independent stores were at a hopeless competitive disadvantage.[15]

The Robinson-Patman amendments were enacted to eliminate these inequities. The exception to price discriminations based on quantitative differences was limited to those making "only due allowance for differences in . . . cost." As noted above, false brokerage allowances and the paying for or furnishing of nonproportional services or facilities were banned outright. The portion

---

[15] Final Report on the Chain-Store Investigation, S. Doc. No. 4, 74th Cong., 1st Sess.

of § 2 (b) preceding the proviso, on which Simplicity relies, was inserted in the House bill for the sole purpose of laying down "directions with reference to procedure including a statement with respect to burden of proof." [16] It was clearly not intended to have any independent substantive weight of its own. [17]

We hold, therefore, that neither "cost-justification" nor an absence of competitive injury may constitute "justifi-

---

[16] H. R. Rep. No. 2287, 74th Cong., 2d Sess., p. 16.

[17] As reported out of Committee, the equivalent of § 2 (b) (which was § 2 (e) in the House bill) applied only to price discriminations. During the floor debate, Congressman McLaughlin introduced an amendment which would add "or services or facilities furnished" at appropriate places in the subsection. He said, "Mr. Chairman, this is a committee amendment agreed to unanimously by the committee. . . . It simply allows a seller to meet not only competition in price of other competitors but also competition in services and facilities furnished." 80 Cong. Rec. 8225. The amendment was adopted without further comment. Throughout the debate, what reference there was to this subsection (other than to the proviso) was to the effect that it was a "procedural" or "burden of proof" provision. See, e. g., 80 Cong. Rec. 8110, 9414, 9418. Congressman Patman, referring to it as a "burden of proof" provision, said "Let me analyze that for you. What does that mean? It means exactly the rule of law today. It is a restatement of existing law. So far as I am concerned you can strike it out. It makes no difference." 80 Cong. Rec. 8231. This statement, coming from one of the authors of the bill, makes it clear beyond peradventure that the provision in question was not intended to operate as a source of substantive defenses. See also *Automatic Canteen Co.* v. *Federal Trade Comm'n, supra,* 346 U. S., at 78.

The history of the Senate bill is not helpful. As reported out of Committee, it contained neither a provision comparable to § 2 (b) nor one comparable to § 2 (e). S. Rep. No. 1502, 74th Cong., 2d Sess. A provision identical to § 2 (b) was adopted as a floor amendment at a time when the bill did not in terms even cover the furnishing of services and facilities. 80 Cong. Rec. 6435–6436. The short debate on the amendment is not enlightening.

cation" of a prima facie § 2 (e) violation.[18]   The judg-
ment of the Court of Appeals must accordingly be
reversed insofar as it set aside and remanded the
Commission's order and affirmed as to the remainder.

*It is so ordered.*

---

[18] While both of these questions have been presented to us in
terms of the "justification" clause of § 2 (b), we are equally con-
vinced that the competitive injury and cost-differential clauses of
§ 2 (a) cannot be read *directly* into § 2 (e). *Elizabeth Arden, Inc.,* v.
*Federal Trade Comm'n, supra,* note 10; *Corn Products Refining Co.*
v. *Federal Trade Comm'n, supra,* note 10; *Great Atlantic & Pacific
Tea Co.* v. *Federal Trade Comm'n, supra,* note 10.   It is true that,
in reference to the cost-differential clause, we have said, "Time and
again there was recognition in Congress of a freedom to adopt and
pass on to buyers the benefits of more economical processes." *Auto-
matic Canteen Co.* v. *Federal Trade Comm'n, supra,* 346 U. S., at
72.   But the contexts of the statements referred to show that the
benefits were to be made available in *price* differentials or not at
all. See, *e. g.,* 80 Cong. Rec. 8106–8107, 8111–8112, 8114, 8127–8128,
8137, 9415; H. R. Rep. No. 2287, 74th Cong., 2d Sess. See also notes
12 and 13, *supra.*