EASTERN AUTO DISTRIBUTORS, INC., Appellant,

v.

PEUGEOT MOTORS OF AMERICA, INC., a foreign corporation, Appellee,

and

Automobiles Peugeot, Societe Anonyme Regie Par Les Articles, a French corporation and/or entity, Defendant.

EASTERN AUTO DISTRIBUTORS, INC., Appellee,

v.

PEUGEOT MOTORS OF AMERICA, INC., a foreign corporation, Appellant,

and

Automobiles Peugeot, Societe Anonyme Regie Par Les Articles, a French corporation and/or entity, Defendant.

Nos. 85–1541(L), 85–1587.

United States Court of Appeals, Fourth Circuit.

Argued Feb. 4, 1986.

Decided June 25, 1986.

---

Thomas F. McPhaul (Robert C. Nusbaum, Joseph R. Lassiter, Jr., Hofheimer, Nusbaum, McPhaul & Brenner, Norfolk, Va., on brief), and Alan M. Frey (Boring, Frey & Parrott, P.C., Vienna, Va., on brief), for appellant.

John Y. Pearson, Jr. and Conrad M. Shumadine (Willcox & Savage, P.C., Norfolk, Va., Peter S. Paine, Jr., Cleary, Gottlieb, Steen & Hamilton, New York City, on brief), for appellee.

Before WINTER, Chief Circuit Judge, PHILLIPS and SPROUSE, Circuit Judges.

SPROUSE, Circuit Judge:

Eastern Auto Distributors, Inc. (EAD) brought this action against Peugeot Motors of America, Inc. (PMA) and Automobiles Peugeot, S.A. asserting numerous breach of contract, civil conspiracy, antitrust, Robinson-Patman Act and Automobile Dealers Day in Court Act claims. PMA filed a counterclaim alleging breach of contract and antitrust violations by EAD. EAD and PMA are parties to a Peugeot distribution agreement, and this dispute arises out of that relationship. The claims and counterclaims raised a wide variety of issues which were resolved after years of trial preparation, a lengthy trial and the resulting judgment. Prior to trial, the district court dismissed both EAD's and PMA's antitrust claims and EAD's civil conspiracy claim. At the close of EAD's evidence, the court directed a verdict in favor of Automobiles Peugeot, S.A. on all of EAD's claims and directed a verdict in favor of PMA on EAD's Robinson-Patman Act claims. The jury subsequently found for EAD on its breach of contract claims concerning vehicle shortages and withdrawal of EAD's Delaware territory and awarded damages of $50,000 and $262,042.23, respectively, on each claim. The jury found for PMA on EAD's Automobile Dealers Day in Court Act claim and against PMA on its counterclaim for breach of contract by EAD. The district court later entered judgment notwithstanding the verdict in favor of PMA on EAD's breach of contract claim concerning vehicle shortages, thereby eliminating the $50,000 damage award. Both EAD and PMA appeal.

I. *Facts*

This dispute revolves around the distribution of Peugeot vehicles and products in the United States. Automobiles Peugeot, S.A. (AP), a French corporation, manufactures the automobiles in France and sells them to various importers throughout the world. PMA, a Delaware corporation, is the exclusive importer of Peugeot products into the United States. For many years, PMA sold the vehicles it had purchased from AP to several intermediate distributors. Pursuant to an agreement with PMA, each of these distributors had the exclusive right to supply Peugeot vehicles to retail Peugeot dealers in a different section of this country. EAD was and still is the exclusive distributor for the southeastern United States. PMA gradually acquired the other intermediate distributors, however, and merged them into PMA. As

a result, EAD has been the sole remaining independent distributor of Peugeot products in the United States since 1974. This consolidation has forced PMA to "wear two hats": it is both the sole importer of Peugeot products into the United States and the sole distributor of Peugeot products throughout all of the United States with the exception of the southeast region maintained by EAD.

Most of EAD's claims stem from what it contends was disparate treatment by PMA. According to EAD, PMA (the importer) discriminated against EAD and its retail dealers in favor of PMA (the distributor) and its retail dealers. The many instances of alleged unfair treatment date back to the mid-1970's. First, PMA offered a parts repurchase program to its dealers, but not to EAD's dealers.[1] Second, EAD claims that PMA furnished its dealers with the product information necessary to keep abreast of Peugeot developments, but consistently refused to furnish such information to EAD or its dealers. Third, in order for EAD to participate in dealer cash incentive programs, EAD was required to contribute twenty-five percent of the amount of the incentive offered, while PMA contributed the other seventy-five percent. PMA contributed one hundred percent of the amount of the incentive for its dealers. PMA asserts that any difference in the way it treated retail dealers was not discriminatory, but resulted from the fact that it interacted with its dealers as a distributor, whereas its dealings with EAD were as an importer.

EAD contends that PMA began a more direct practice of unfair treatment in the latter 1970's-early 1980's. American Peugeot dealers were occasionally responsible for sales of Peugeots in France to American customers who were moving to or traveling in Europe. EAD claims that PMA employed an inequitable procedure for these sales in which PMA bypassed EAD and dealt directly with EAD's dealers,

causing EAD to lose commissions. In addition, with the advent of Peugeot's new turbo-diesel model in 1980, PMA required EAD to establish a full-time technical training school to keep its dealers' service personnel abreast of turbo-diesel developments.

The broadest claim asserted by EAD, however, concerned vehicle shortages. EAD claimed that from 1977 through 1981, PMA's (the importer) system of allocating vehicles to EAD and PMA (the distributor) during periods of shortages resulted in a significant loss of sales by EAD. The vehicle ordering and allocation system employed by PMA was not in dispute. AP, the French manufacturer, required PMA to order vehicles by placing a firm order for one month's production and estimated orders for the following three months' production. For example, on each September 15, PMA customarily sent AP a firm order for November production, along with estimated orders for December, January and February production. On each October 15, PMA sent AP the firm order for December production, along with estimates for January, February and March; and so on. As the order for a given month went from its first estimate to its second and third estimates and finally became a firm order, PMA was allowed to vary the estimate less and less, until the number of vehicles was finally frozen in the firm order.

Because this ordering system required PMA (the importer) to estimate the number of vehicles it needed far in advance of actual demand, it required EAD and PMA (the distributor) to submit similar monthly firm orders and estimates. PMA (the importer) would combine the orders from EAD and PMA (the distributor) to determine its monthly order to AP.

Problems arose, however, when AP failed to deliver all of the vehicles ordered by PMA. These shortages occurred for a variety of reasons, including production delays, parts shortages and volatile demand

---

1. A parts repurchase program allows dealers to return a portion of their obsolete parts invento-

ry for credit.

for certain types of vehicles.[2] When confronted with a shortage, PMA (the importer) was forced to allocate the lesser number of available vehicles between EAD and PMA (the distributor). Prior to March 1980, PMA (the importer) allocated ten percent of the available vehicles to EAD, based on EAD's then annual sales goal of ten percent of total United States Peugeot sales. The remaining ninety percent of the vehicles were allocated to PMA (the distributor). In anticipation of production problems and resulting shortages with the introduction of the new Peugeot Model 505, PMA changed the system for allocating vehicles during periods of shortages in March 1980. Thereafter, PMA (the importer) allocated available vehicles based on EAD's and PMA's (the distributor) percentage of the total order to AP. In other words, if twenty percent of the order to AP represented vehicles ordered by EAD, with the other eighty percent ordered by PMA (the distributor), EAD would get twenty percent of the available vehicles and PMA (the distributor) would get the other eighty percent. EAD claimed that it lost large numbers of sales from 1977–81 because of PMA's system for allocating vehicles.

The relationship between EAD and PMA further deteriorated in March 1981 when PMA withdrew the State of Delaware from EAD's territory. The withdrawal was the culmination of a long-standing controversy between the parties over EAD's failure to place a Peugeot dealership in Wilmington, Delaware. Under the EAD–PMA agreement, EAD had the primary responsibility for enfranchising retail Peugeot dealers within its territory. The Wilmington market first became an "open point"[3] in 1977 when EAD terminated the franchise of its existing Peugeot dealer in the city, Baker Motors. EAD promptly began negotiating with Colonial Chevrolet, another Wilmington automobile dealer, to take over the Peugeot franchise formerly held by Baker Motors. Colonial Chevrolet ultimately declined to take the Peugeot franchise, however, and the Wilmington market remained without a Peugeot dealer for the next three years.

There was evidence that in early 1980, PMA presented EAD with a list of five open points, including the Wilmington market, which EAD promised to place dealers in by the end of the year. In October and November 1980, EAD contacted two Wilmington automobile dealers, Delaware Oldsmobile and Quillen Brothers Ford, about the possibility of taking on a Peugeot franchise. Although Delaware Oldsmobile was willing to take the franchise, EAD subsequently decided that it was not a suitable prospect since it already had a Volvo franchise. EAD failed to pursue the possibility of awarding the franchise to Quillen Brothers Ford at that time. Dissatisfied with EAD's continued failure to place a Peugeot dealer in the Wilmington market, PMA unilaterally withdrew Delaware from EAD's territory and awarded the franchise to Delaware Oldsmobile in March 1981.

EAD filed suit against PMA and AP in the district court on July 9, 1981 alleging numerous breaches of the EAD–PMA agreement and violations of the federal antitrust laws,[4] the Robinson-Patman Act, 15 U.S.C. § 13 (1982), the Automobile Dealers Day in Court Act (ADDICA), 15 U.S.C. § 1221 *et seq.* (1982), and Virginia's conspiracy statute, Va. Code § 18.2–499 (1982). PMA asserted a counterclaim for breach of the EAD–PMA agreement and violations of the federal antitrust laws.[5] After extensive discovery and numerous pretrial motions, the district court dismissed both

---

**2.** Testimony revealed that during the oil crisis in early 1979, the diesel automobile market in the United States went from conditions of extreme glut to conditions of extreme shortage in a very short period of time.

**3.** An "open point" is a designated city or market area which lacks a Peugeot dealership.

**4.** EAD alleged that PMA had violated sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2 (1982).

**5.** PMA alleged that EAD had violated section 1 of the Sherman Act, 15 U.S.C. § 1 (1982) and section 3 of the Clayton Act, 15 U.S.C. § 14 (1982).

EAD's and PMA's antitrust claims and EAD's conspiracy claim. By consent of the parties, the district judge referred the case to a magistrate pursuant to 28 U.S.C. § 636(c), and the case proceeded to trial before a jury on January 28, 1985. At the close of EAD's evidence, the district court directed a verdict in favor of AP on all of EAD's claims. In addition, the court granted a directed verdict in favor of PMA on EAD's Robinson-Patman Act claims.

The jury returned a verdict in favor of EAD for breach of contract as a result of vehicle shortages and withdrawal of the Delaware market from EAD's territory and awarded damages of $50,000 and $262,-042.23, respectively, on each claim. The jury found for PMA on EAD's ADDICA claim. It found for EAD on PMA's counterclaim for breach of contract by EAD. The district court later entered judgment notwithstanding the verdict in favor of PMA on EAD's breach of contract claim concerning vehicle shortages, but left standing EAD's judgment of $262,042.23 on its claim concerning the Delaware market. The court entered judgment in accordance with the jury verdict on the other issues.

Both parties appeal the district court's judgment alleging a variety of errors in the proceedings below. EAD contends that the district court erred: (1) in directing a verdict in favor of PMA on EAD's Robinson-Patman Act claims; (2) in not permitting all of EAD's claims under the ADDICA to go to the jury; (3) in refusing to allow the damages testimony of EAD's expert witnesses; (4) in granting judgment notwithstanding the verdict against EAD on its vehicle shortages claim; and (5) in failing to grant injunctive relief concerning the Delaware territory claim. PMA argues that the district court erred in failing to grant judgment notwithstanding the verdict in favor of PMA on EAD's Delaware territory claim.

## II. *Robinson-Patman Act*

■ EAD contends that PMA violated sections 2(d) and 2(e) of the Robinson-Patman Act (the Act), 15 U.S.C. § 13(d), (e) (1982), by providing cash incentives, parts repurchase programs and training facilities to PMA's dealers but not to EAD's dealers. At the close of EAD's evidence, the district court directed a verdict in favor of PMA on the grounds that (1) EAD failed to prove the existence of competition between its dealers and PMA's dealers, and (2) EAD failed to prove damages.

Sections 2(d) and 2(e) of the Act prohibit the providing of "anything of value" or the "furnishing [of] any services or facilities," respectively, unless the thing of value, service or facility is available on "proportionally equal terms" to, respectively, all other competing customers or all other purchasers.[6] An essential element to a claim under these provisions is the existence of competition between the favored customers and the disfavored customers. *See FTC v. Simplicity Pattern Co.*, 360 U.S. 55, 62–64, 79 S.Ct. 1005, 1010–11, 3 L.Ed.2d 1079 (1959). Thus, discrimination by a seller in the provision of services to retail customers and wholesale customers would typically

---

6. Sections 2(d) and 2(e) of the Act provide in full:

    (d) It shall be unlawful for any person engaged in commerce to pay or contract for the payment of anything of value to or for the benefit of a customer of such person in the course of such commerce as compensation or in consideration for any services or facilities furnished by or through such customer in connection with the processing, handling, sale, or offering for sale of any products or commodities manufactured, sold, or offered for sale by such person, unless such payment or consideration is available on proportionally equal terms to all other customers compet-

ing in the distribution of such products or commodities.

    (e) It shall be unlawful for any·person to discriminate in favor of one purchaser against another purchaser or purchasers of a commodity bought for resale, with or without processing, by contracting to furnish or furnishing, or by contributing to the furnishing of, any services or facilities connected with the processing, handling, sale, or offering for sale of such commodity so purchased upon terms not accorded to all purchasers on proportionally equal terms.

15 U.S.C. § 13(d), (e) (1982).

not be actionable since retailers and wholesalers do not normally compete with each other. *TriValley Packing Association v. FTC*, 329 F.2d 694, 708–10 (9th Cir. 1964). Similarly, a seller may lawfully discriminate in the provision of services to two retail customers located in separate geographic markets since they do not compete for the same consumers. *Id.*

To establish violations of sections 2(d) and 2(e), EAD had to prove that its dealers competed with PMA's dealers. As retail dealers of Peugeot automobiles, the two sets of dealers obviously competed at the same functional level. EAD had to prove, however, that its dealers and PMA's dealers also competed in the same geographic market, i.e., that the two sets of dealers competed for the same customers. This task was made difficult by the fact that EAD's dealers are located exclusively within EAD's southeastern territory, while PMA's dealers are located throughout the rest of the country. *See, e.g., Lupia v. Stella D'oro Biscuit Co.*, 586 F.2d 1163, 1171 (7th Cir. 1978), *cert. denied*, 440 U.S. 982, 99 S.Ct. 1791, 60 L.Ed.2d 242 (1979); *Carlo C. Gelardi Corp. v. Miller Brewing Co.*, 421 F.Supp. 237, 245–46 (D.N.J.1976). At the close of EAD's evidence, the district court ruled that EAD had failed to establish the necessary degree of competition and directed a verdict in favor of PMA.

EAD contends that there is evidence of significant competition between the two sets of dealers on the fringes of EAD's territory and that this degree of competition is sufficient to maintain its claim under sections 2(d) and 2(e) of the Act. The evidence consists of a report by PMA that of the 81,000 Peugeots sold in the United States between 1976 and 1982, 800, or less than one percent, were cross-border sales.[7] Of the 800 cross-border sales, the report indicates that approximately 260, or one-third, occurred in the Memphis, Tennessee area. The greater Memphis area is the only place where a PMA dealer and an EAD dealer are located within fifty miles of each other. Although EAD asserts that the two sets of dealers compete in other areas along the fringes of EAD's territory,[8] it offered no evidence other than the PMA report to support the existence of such competition.

The standard of review regarding a directed verdict "is essentially whether, without weighing the evidence or considering the credibility of the witnesses, 'there can be but one conclusion as to the verdict that reasonable jurors could have reached.' " *Gairola v. Commonwealth of Virginia Department of General Services*, 753 F.2d 1281, 1285 (4th Cir. 1985) (quoting *Wheatley v. Gladden*, 660 F.2d 1024, 1027 (4th Cir. 1981)). A mere scintilla of evidence is insufficient to defeat a motion for a directed verdict. *Id.* Rather, an issue can only be submitted to a jury when it is supported by substantial evidence which shows a probability and not a mere possibility of proof. *Mayberry v. Dees*, 663 F.2d 502, 510 (4th Cir. 1981), *cert. denied*, 459 U.S. 830, 103 S.Ct. 69, 74 L.Ed.2d 69 (1982).

With the exception of the Memphis area, EAD simply failed to present sufficient evidence which would allow a jury to conclude that its dealers and PMA's dealers compete for the same customers. EAD presented no evidence of the relevant geographic markets for Peugeot vehicles. EAD instead relied solely upon the PMA report that less than one percent of total Peugeot sales were cross-border sales. EAD's president testified, however, that he did not know the reasons behind any of the cross-border sales in the report, and he acknowledged that such sales occurred for a variety of reasons other than competition between the two sets of dealers.[9] Unsup-

---

7. A cross-border sale is a sale by a PMA dealer to a customer who registers the vehicle in EAD's territory or *vice versa*.

8. EAD contends that competition occurred between PMA's dealer in Savannah, Georgia and EAD's dealer in Atlanta, Georgia and that there was competition between a PMA dealer and an EAD dealer along the Ohio-Kentucky border.

9. For example:

> Q. And it could have been that a large number were made by military personnel

ported by evidence of the relevant geographic markets or other evidence of actual competition, we find that the small number of unexplained cross-border sales in the PMA report could not reasonably support a finding of competition between PMA's dealers and EAD's dealers. *See Lupia,* 586 F.2d at 1171 ("de minimis" or sporadic competition insufficient to state a claim under the Act).[10]

### III. *Automobile Dealers Day in Court Act*

■ The district court instructed the jury that EAD claimed that PMA violated the ADDICA, 15 U.S.C. § 1221 *et seq.* (1982), by withholding shipments of new turbo-diesel automobiles until EAD established a technical training school. The jury returned a verdict on the issue in favor of PMA. EAD argues on appeal that the district court erred in not permitting all of EAD's ADDICA claims to go to the jury. In addition to the training school claim, EAD asserts that the jury should have been instructed to consider whether PMA violated the ADDICA by its conduct with respect to EAD concerning: (1) parts repurchase programs; (2) information on new products; (3) dealer cash incentives; (4) overseas sales; (5) vehicle shortages; and (6) the Delaware territory.

EAD's argument on appeal, however, ignores the proceedings below. The record reveals that at trial EAD limited its ADDICA claim to the training school issue.[11] Moreover, EAD did not specifically object to the absence of its other claims from the jury instructions. Having failed to pursue other ADDICA claims at trial, EAD is foreclosed from asserting them on appeal. *Bilancia v. General Motors Corp.,* 538 F.2d 621 (4th Cir. 1976).

EAD's argument concerning additional ADDICA claims fails for another reason as well. Actual or threatened coercion or intimidation is an essential element to a claim under the ADDICA. 15 U.S.C. § 1221(e) (1982); *Minson Plymouth, Inc. v. Chrysler Motors Corp.,* 554 F.2d 1266, 1267 (4th Cir. 1977). EAD concedes that the training school issue is the only one of its purported ADDICA claims that could supply the necessary ingredient of coercion or intimidation. Since the jury found for PMA on the training school issue, and EAD has not challenged its verdict, EAD's other ADDICA claims must also fail.

### IV. *Vehicle Shortages*

#### A. *Exclusion of expert testimony*

■ EAD sought to prove damages for its vehicle shortages claim through the tes-

---

who titled their car in their home states for tax purposes; is that correct?

[EAD President]: That's a small part of it, I guess, yes.

Q. But we do know in Norfolk that happens a great deal, don't we?

[EAD President]: Yes.

**10.** In light of this holding, it is not necessary for us to consider whether EAD failed to prove damages under the rationale of *J. Truett Payne Co. v. Chrysler Motors Corp.,* 451 U.S. 557, 101 S.Ct. 1923, 68 L.Ed.2d 442 (1981).

**11.** EAD's narrowing of its ADDICA claim to the training school issue is clearly evidenced on several occasions during the proceedings. For example, during a hearing on PMA's motion for a directed verdict, but prior to any ruling by the court, EAD's counsel stated:

[EAD]: Dealer's Day in Court Act. We agree that plaintiff's claim under this act rises or falls on the issue of whether EAD is contractually bound to build and maintain the kind of training facility it was required to

establish in late 1980 as a condition for receiving those turbodiesels.

THE COURT: Thank you for that. I think the one major thing we'll all benefit from in this discussion is some definition and narrowing of issues. That's what your Dealer's Day in Court claims are.

[EAD]: That's right.

Later in the trial, the district court again sought to clarify EAD's ADDICA claim:

THE COURT: The purpose of this is to make sure that we are all in agreement of what the remaining issues are so we have a clear approach.

Let's take the easy one first. I think it's plain from the discussion on the motion for directed verdict that we're all in agreement that under the dealer day in court heading, there is only one claim now being asserted by the plaintiff, and that is that the defendant used prohibited coercion and intimidation to cause EAD to reopen the training school before they could get the 1980 505 turbo-diesels?

[EAD]: Yes.

timony of an economist, Dr. Gary L. French. Dr. French proposed to, testify regarding damages suffered by EAD from its inability to establish additional retail dealers due to vehicle shortages allegedly caused by PMA. His damages analysis was based in part on a comparison of the relative levels of inventories maintained by EAD and PMA during periods of shortages. Following extensive *voir dire*, the district court ruled that Dr. French's testimony should be excluded because (1) it would violate a discovery order issued by the court prior to trial, and (2) it was based on assumptions which were speculative and not supported by the evidence.

Discovery on the part of both sides. in this case was extensive and lasted well over three years. Through interrogatories, PMA sought to discover the basis of Dr. French's testimony concerning damages on the shortages claim. After extensive delay and unresponsive answers on the part of EAD, the district court ruled that EAD could supplement its answers one final time and thereafter it would be limited at trial to the information contained in those answers. EAD subsequently filed its final supplementary answers. The damages analysis set forth in those final supplementary answers was not in any way based upon the relative levels of inventories maintained by EAD and PMA during periods of shortages.[12]

At trial, Dr. French proposed to base his testimony concerning damages on the inventory levels of the two distributors during periods of shortages. PMA objected to the testimony on the grounds that the inventory information was not included in EAD's final supplementary answers, therefore, EAD was barred from using it at trial under the district court's pretrial ruling. The court held that the inventory information was barred by its previous order and excluded Dr. French's testimony concerning damages stemming from vehicle shortages.

We cannot say that the district court committed error in excluding Dr. French's testimony. The amount of discovery produced in this case was massive, and the process lasted well over three years. The trial judge did not abuse his discretion when he enforced the pretrial ruling that EAD would be limited to the information contained in its final supplementary answers.[13]

The district court also acted within the proper bounds of its discretion in excluding Dr. French's testimony on the grounds that it was based on assumptions which were speculative and not supported by the record. As indicated earlier, EAD claimed damages based primarily upon lost sales stemming from its alleged inability to establish new retail dealers due to vehicle shortages. Dr. French's testimony proposed to quantify this loss by estimating the number of new dealers that EAD would have established and the additional sales which those dealers would have generated.

While Dr. French's theory for calculating damages may have been proper, its application in the instant case was based upon two important assumptions. First, to deter-

---

**12.** After filing its final supplementary answers, EAD sought, and was ultimately granted, permission to inspect PMA's inventory records for a second time. EAD contends that it did not discover the relevant inventory information until this second inspection, therefore, it should not be bound by its prior final supplementary answers.

We do not find this argument persuasive since EAD had already inspected PMA's inventory records once and had ample opportunity prior to filing its final supplementary answers to seek inspection again. EAD was surely aware that such inventory information existed, and if it intended to rely on the information at trial, it should have revealed such in its final supple-

mentary answers. Moreover, EAD never sought to amend its final supplementary answers after the second inspection to include the inventory information. This failure resulted in PMA not becoming aware of EAD's proposed use of the inventory information until immediately before trial.

**13.** The district court also ruled prior to trial that a second economist for EAD, Dr. Michael J. Ileo, could testify about inventory matters only in rebuttal. At trial, the court acted within its discretion when it excluded Dr. Ileo's proposed testimony since PMA had presented no evidence concerning inventories in its defense.

mine the number of new dealers that EAD would have established, Dr. French assumed that EAD's dealerization effort was delayed for two years due to vehicle shortages. In other words, absent shortages, EAD would have had the same number of dealers in a given year that it actually had two years later. This assumption was not supported by any evidence presented at trial, and EAD has failed to otherwise offer any reasons why it might be accurate.

Second, to determine the number of vehicles which the new dealers would have sold, Dr. French calculated EAD's percentage share of the relevant market in 1983 and applied that figure to the period from 1977–81 for which damages were claimed. The assumption that EAD's market share from 1977–81 would have been exactly the same as its share in 1983, however, fails to take account of EAD's admittedly more efficient dealer force in 1983, the large increase in demand for Peugeot products during this period, the shift in demand from gas to diesel automobiles and then back to gas, and the introduction of new Peugeot models. *See Coleman Motor Co. v. Chrysler Corp.*, 525 F.2d 1338, 1353 (3d Cir. 1975) (damages testimony improper where plaintiff's expert witnesses failed to account for significant factors bearing upon its market share); *see also* Parker, *Measuring Damages in Federal Treble Damage Actions*, 17 Antitrust Bull. 497, 506 (1972).

Scrutiny of expert testimony is especially proper where it consists of "an array of figures conveying a delusive impression of exactness in an area where a jury's common sense is less available than usual to protect it." *Herman Schwabe, Inc. v. United Shoe Machinery Corp.*, 297 F.2d 906, 912 (2d Cir.), *cert. denied*, 369 U.S. 865, 82 S.Ct. 1031, 8 L.Ed.2d 85 (1962). In light of the unsupported and speculative assumptions underlying Dr. French's calculations and the extremely sensitive nature of his figures,[14] we cannot say that the district court abused its discretion in excluding his testimony on this alternative

ground. *See Horton v. W.T. Grant Co.*, 537 F.2d 1215, 1218 (4th Cir. 1976).

### B. *Judgment notwithstanding the verdict*

■ At trial, EAD presented evidence of eleven specific instances in which PMA allegedly failed to deliver all the vehicles ordered by EAD. It claimed damages in the amount of its gross profit per vehicle for each undelivered vehicle for a total of $170,179. PMA, in turn, presented evidence that it was not contractually responsible for each of the shortages alleged by EAD. The district court submitted the issue to the jury, and it returned a verdict in favor of EAD for $50,000. The district court subsequently granted PMA's motion for judgment notwithstanding the verdict (JNOV) on the grounds that (1) the only reasonable interpretation of the evidence was that the shortages did not breach the EAD–PMA agreement, and (2) there was no evidence that EAD was damaged by the shortages.

We must affirm the district court if we find that the evidence and its inferences, considered as a whole and viewed in the light most favorable to the nonmoving party, can support only one reasonable conclusion—that the moving party is entitled to judgment notwithstanding the adverse verdict. *Miller v. Premier Corp.*, 608 F.2d 973, 981 (4th Cir. 1979). *See Whalen v. Roanoke County Board of Supervisors*, 769 F.2d 221, 224 (4th Cir. 1985). Here JNOV was proper since EAD failed to present any evidence from which the jury could find that it was damaged by the shortages. The district court instructed the jury:

In considering damages related to plaintiff's claim of vehicle shortages, you are further instructed that the mere fact that a vehicle order was not filled by PMA, or could not be placed with PMA, does not, standing alone, mean that EAD was damaged thereby.

In order to prove damages on the shortages claimed, EAD has the burden

**14.** Under the theory employed by Dr. French, if EAD had sold five hundred fewer cars in 1983 there would have been no damages at all due to shortages from 1977–1981.

of proving by a preponderance of the evidence that the shortages caused EAD to lose sales of vehicles which it otherwise would have made.

EAD presented no evidence of lost sales due to the shortages. Although it had records of its dealers orders and its own inventories, it failed to show one instance in which a dealer's order went unfilled. No EAD dealer testified that during the periods of alleged shortages it did not receive the vehicles it ordered. In the total absence of any evidence of lost sales from which the jury could determine damages, the district court properly granted PMA's motion for JNOV.[15]

## V. *Delaware Territory*

■ The jury found that PMA breached the EAD–PMA agreement by withdrawing the State of Delaware from EAD's franchise area of primary responsibility and awarded EAD $262,042.23 in damages. PMA contends that the district court should have granted its motion for JNOV because (1) PMA's conduct did not amount to a breach of the agreement as a matter of law, and (2) EAD failed to prove damages. EAD argues that the district court erred in failing to award injunctive relief returning the Delaware territory to EAD.

Whether PMA's withdrawal of the Delaware territory from EAD was a breach of their contract was an issue properly resolved by the jury. The instructions submitted by the district court and agreed to by counsel provided that the jury should find for EAD if "PMA lacked good cause for withdrawing in March 1981 the state of Delaware from EAD's area of primary franchise responsibility...." The determination of whether PMA had "good cause" to take the action it did was a question of fact. The jury had before it ample evidence from both sides, and we will not disturb its verdict in favor of EAD.

PMA's argument concerning proof of damages, however, gives us pause. EAD was entitled to damages in the amount of lost profits from sales it would have made

in the withdrawn territory. EAD sought to prove this amount through its expert, Dr. French, who testified that EAD's damages were $262,042.23. Dr. French arrived at this figure by multiplying the number of sales made by Delaware Oldsmobile (the dealer established by PMA) with EAD's average profit per sale. Dr. French thus made two important assumptions. First, that EAD would have appointed a dealer in Wilmington at approximately the same time that PMA appointed Delaware Oldsmobile. Second, that EAD's dealer would have sold approximately the same number of vehicles as Delaware Oldsmobile sold. PMA contends that EAD failed to introduce any evidence to support these assumptions and, therefore, that EAD failed to prove its damages and PMA was entitled to JNOV on the award of damages.

In support of its damages claim, EAD presented evidence that in late 1980 it was working toward establishing a Peugeot dealer in Wilmington. During that period, EAD investigated the possibility of granting the dealership to two different dealers, Delaware Oldsmobile and Quillen Brothers Ford. EAD decided not to grant the dealership to Delaware Oldsmobile, the dealer subsequently appointed by PMA, because Delaware Oldsmobile already sold Volvos, a diesel automobile which competed with Peugeot. The owner of Quillen Brothers Ford testified that he discussed the Peugeot dealership with EAD's representatives on several occasions. After one such meeting on November 26, 1980, he indicated to EAD that he was willing to take the dealership. EAD took no further action at that time. After PMA withdrew the Delaware territory and appointed Delaware Oldsmobile in March 1981, EAD again contacted the owner of Quillen Brothers Ford, who agreed to take the dealership. Quillen Brothers Ford later cancelled its dealership upon learning that Delaware Oldsmobile had already been granted a Peugeot dealership in the Wilmington area.

Although the question is close, we conclude that the evidence was sufficient to

---

**15.** Since JNOV was proper in light of EAD's failure to present evidence of damages, we need not address the alternative grounds adopted by

the district court—that no reasonable jury could have found that the shortages were a breach of the EAD-PMA contract.

permit a jury rationally to find for EAD on the damages element of its claim. In reaching this conclusion, we are especially mindful that we are not to weigh the evidence and its inferences, but to consider them in the light most favorable to EAD. *Whalen v. Roanoke County Board of Supervisors*, 769 F.2d 221, 224 (4th Cir. 1985). Dr. French explained his assumptions to the jury during his testimony. We think that there was sufficient evidence to allow the jury to find that his assumptions were reasonable and to accept Dr. French's testimony concerning damages.

Finally, we hold that, in the absence of any award for future damages, the district court should have granted injunctive relief returning the State of Delaware to EAD's franchise area of primary responsibility. We remand the case to the district court so that it may enter an appropriate order to that effect. In all other respects the judgment of the district court is affirmed.

AFFIRMED IN PART AND REMANDED.