Argued and submitted July 16, reversed and remaned for new trial on issue of damages December 1, 1982

# VonRAVENSBERG, dba Crystal Ice Co., *Appellant,*

*v.*

# HOUCK-CARROW CORP., *Respondent.*

## (No. 105,679, CA A21580)

653 P2d 1297

Paul J. Lipscomb, Salem, argued the cause for appellant. With him on the briefs was Blair, MacDonald, Jensen & Lipscomb, Salem.

Bruce W. Williams, Salem, argued the cause for respondent. With him on the brief was Williams & Spooner, Salem.

Before Richardson, Presiding Judge, and Thornton and Van Hoomissen, Judges.

THORNTON, J.

## THORNTON, J.

Plaintiff appeals from a judgment based on a jury verdict in his favor. He contends that the trial court erred in limiting the amount of damages submitted to the jury.

Plaintiff had been in the ice manufacturing and distributing business for 27 years. He moved from California to Eugene in 1971 to start an ice business. In September, 1976, he decided to expand his operations. He contacted Zero Ice Company, a Salem ice business. Zero Ice had been renting the Terminal Ice plant in Salem on a month-to-month basis for manufacturing ice. Plaintiff successfully negotiated for the purchase of Zero Ice's machinery and equipment located at the Terminal Ice plant. He began operations in that location on January, 1977. He rented the building on the same month-to-month basis as Zero Ice.

In March, 1977, the plant was purchased by new owners, who told plaintiff that the plant was eventually going to be demolished. Plaintiff negotiated with the new owners until May 1, 1977, when the parties verbally agreed that plaintiff would enter into a five-year lease plan. Under the plan, plaintiff was to continue to manufacture and distribute ice out of his current plant location and eventually move to the Cold Storage building, a nearby building in Salem also owned by the new owners. Following the close of the "summer ice season"[1] in 1977, plaintiff was to have moved his entire operation to the Cold Storage building. In connection with the move, on May 20, 1977, plaintiff contracted with an engineering firm to move a 10-ton turbo ice maker from plaintiff's operation in Eugene to the Cold Storage building. The move was to have been completed by mid-July, 1977, at which time plaintiff planned to begin manufacturing and storing ice at the Cold Storage location.

On June 15, 1977, allegedly due to defendant's negligence in its use of a cutting torch during demolition work adjacent to the Cold Storage building, a fire totally destroyed the Cold Storage building and its contents. At that time, plaintiff had some refrigeration equipment and

---

[1] The "summer ice season" is approximately 100 days beginning on Memorial Day and ending on Labor Day, the time period when about 80 percent of the ice is sold.

various supplies, including almost his entire inventory of bags for packaging ice, in the Cold Storage building. His business was disrupted. He lost about three weeks of production following the fire because of his inability to obtain replacement bags for packaging. Although after he had received replacement bags, he sold some ice out of the storage he had built up, he was unable to produce new ice fast enough to keep up with demand. He testified that the summer of 1977 was an excellent ice season and that he could have sold all the ice he could have produced.

After the fire, plaintiff continued to operate out of the Terminal Ice plant through the remainder of 1977 and the summer of 1978. He brought this action for the loss of inventory and equipment destroyed and alleged that as a result of defendant's negligence, he suffered "a business loss of approximately $15,000, and suffered a loss of profits in an amount in excess of $100,000."

At trial, plaintiff attempted to introduce evidence of the loss of business that occurred in 1977 and 1978 as a result of the fire destroying the Cold Storage building. Defendant objected to the evidence as being too speculative to allow recovery. Defendant argued that plaintiff only had a month-to-month lease, and so recovery for lost business profits was limited to at most one month. Defendant also contended that the business was too new to warrant recovery of lost profits. The trial court ruled:

> "We have just got some more argument is all — All right, gentlemen, we are on the record, the jury is not present. I just visited the library * * * and I'm firmly convinced that your client can show the loss of $28,022.99 [the value of the destroyed inventory and equipment]. He can show his loss of profits because of the bags for the three week period. But he cannot show a loss of profits — he can show a loss of profit for one month after the fire, but there is no doubt in my mind that for the years '77 and '78, we're getting into nothing but speculation because of the month-to-month tenancy. So that is the way it will be." (Bracketed material supplied.)

Plaintiff testified to the loss of business resulting during the three-week period. He then submitted an offer of proof concerning the loss of profits for 1977 and 1978.

■    The jury found defendant negligent and awarded plaintiff damages of $6,232.80 for lost profits. On appeal, although designated under seven assignments of error, plaintiff essentially presents two issues. First, plaintiff argues that there was sufficient proof of lost profits for 1977 and 1978 to go to the jury and that, accordingly, the court erred in not allowing evidence of the loss to be admitted. Second, plaintiff argues that the court erred in instructing the jury that the maximum recoverable damages were $6,232.80 (representing the three-week loss following the fire) when there was evidence that plaintiff actually sustained a $10,143 loss. Because we hold that the trial court erred in not admitting the lost profits evidence for 1977 and 1978 and remand for retrial on the issue of damages, we need not address plaintiff's second issue.

■ ■    Although most cases dealing with lost profits involve actions for breach of contract, lost profits are also recoverable in tort actions. *Cluck et al v. Fish et al,* 230 Or 63, 368 P2d 626 (1962).[2] The trial court should take the issue of lost profits from the jury only when it can say that the evidence is *clearly insufficient* to establish the claim. *Welch v. U.S. Bancorp,* 286 Or 673, 704, 596 P2d 947 (1979); *Kimball v. Little River Lumber,* 44 Or App 497, 502, 606 P2d 660, *rev den* 289 Or 155 (1980). In *Welch,* the Supreme Court stated:

> " * * * This does not mean that the court should withdraw the question just because the court might not be convinced by the evidence. * * * If reasonable men could be persuaded of the validity of the claim on the evidence presented, the jury must be allowed to make the decision." 286 Or at 705. (Citation omitted.)

■    The term "reasonable certainty" found in cases dealing with lost profits refers to the kind of evidence that the trier of fact must have available to determine whether it is more probable than not that lost profits were incurred. *See Welch v. U.S. Bancorp, supra; Husky Lbr. Co. v. D.R.*

---

[2] Plaintiff argues that "the rule allowing loss of profits in tort actions is generally more liberal than in actions for breach of contract," citing *Cluck et al v. Fish, et al,* 230 Or 63, 368 P2d 626 (1962). Because we hold that the evidence presented was sufficient to go to the jury even under the standard for breach of contract actions, we need not decide whether a different standard should apply for tort actions.

*Johnson Lbr. Co.,* 282 Or 481, 488, 579 P2d 235 (1978); *Cont. Plants v. Measured Mkt.,* 274 Or 621, 547 P2d 1368 (1976); *Kimball v. Little River Lumber, supra.* It does not refer to the quantum of proof required. Proof of a history of profitable operation is not a prerequisite to the recovery of lost profits, so long as supporting evidence of profits is submitted. *Welch v. U.S. Bancorp, supra; Schafer v. Sunset Packing,* 256 Or 539, 474 P2d 529 (1970). Further, it is not necessary that the exact amount of lost profits incurred be proved but only that a satisfactory conclusion can be reached from the estimates of the witnesses. *See Furrer v. Int'l Health Assurance,* 256 Or 429, 442, 474 P2d 759 (1970).

Our task on review is to determine if the evidence presented at trial, and in plaintiff's offer of proof, was "clearly insufficient" to establish a claim for lost profits for 1977 and 1978. Plaintiff testified that he had been in the ice-making business for 27 years. He testified that with the assistance of his accountant he had made projections of his production loss in 1977 and 1978. He calculated his annual output based on his production capacity and his annual profit margin based on past history and industry standards.[3] He testified that the price per ton of ice used in the calculations was an average price during the relevant period. He itemized his costs involved in producing ice at the destroyed Cold Storage building.[4] He also substracted his fixed and variable costs in producing and distributing the ice. Although plaintiff had only recently located in Salem, he had operated out of Eugene for about six years and had established contracts and distribution outlets in the Salem area.[5] He also testified that 1977 was a good year

---

[3] Plaintiff estimated a "conservative" profit margin of 36 percent. He testified that profits in the industry were as high as 50 to 60 percent.

[4] Plaintiff testified that the capital expenses included the $9,205 contract with the engineering firm for installation of the turbo and $3,000 for wall construction in the Cold Storage building as well as electrical and trucking expenses of $4,000 and $3,000 respectively.

[5] Plaintiff testified that in the Salem area he had about 35 "merchandisers" (merchants who maintained ice boxes in front of their stores) to supply as well as seven or eight vending machines and several dispensing machines which he owned.

for the ice business and that he could have sold all he could have produced.[6]

Defendant did not contend at trial, nor does it argue on appeal, that the production capacity figures or sales price figures used by plaintiff were inflated or inaccurate. In its brief, defendant apparently accepts plaintiff's profit margin as accurate, but it primarily argues that, because plaintiff was renting on a month-to-month basis at the time of the fire, he cannot claim profits beyond the one-month period following the fire. The month-to-month tenancy was apparently the reason for the trial judge's ruling limiting the evidence of lost profits.[7]

■        Plaintiff testified that shortly before the fire he was waiting for a five-year written lease to be drafted by the new owner's attorney on terms already negotiated. Although the lease was never signed, because of the destruction of the Cold Storage building, plaintiff continued to operate out of the Terminal Ice plant on a month-to-month basis through 1978. There was no evidence presented to establish that the new owner intended to terminate the month-to-month arrangement for either the Cold Storage building or the Terminal Ice plant. In any event, such a contingency would be but another factor for the jury to consider in determining whether it was probable that profits were lost. It could not operate to foreclose an award of lost profits altogether. If it was foreseeable that plaintiff would have operated out of the Cold Storage building but for the fire, the exact terms of the rental agreement do not control. Plaintiff presented evidence of lost profits that was not clearly insufficient to establish his lost profits claim. Accordingly, we reverse and remand for a new trial on the issue of damages.

Reversed and remanded for a new trial on the issue of damages only.

---

[6] The evidence present in the offer of proof involves the type of calculations used as "supporting data" in other cases involving lost profits. *See, e.g., Hardwick v. Dravo Equipment Company,* 279 Or 619, 569 P2d 588 (1977); *Schafer v. Sunset Packing, supra; Cluck et al v. Fish, et al, supra; Sprague v. Magruder,* 40 Or App 331, 594 P2d 1324 (1979).

[7] This is unclear from the record because instead of limiting evidence of lost profits to the one month period following the June 15, 1977, fire, the trial court only allowed evidence of three weeks of lost production.