**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**42.13 ACRES OF LAND, Defendant,**

and

**Pacific Gas and Electric Company,**
**Defendant–Appellant.**

**No. 93–16248.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 16, 1995.

Decided Jan. 11, 1996.

Richard Murray, McCutchen, Doyle, Brown & Enersen, San Francisco, California, for defendant-appellant.

Robert L. Klarquist, United States Department of Justice, Washington, DC, for plaintiff-appellee.

Before REINHARDT, THOMPSON and KLEINFELD, Circuit Judges.

## OPINION

KLEINFELD, Circuit Judge:

The issue in this case is whether a federal condemnation award has to include the value of an expectation of renewal of a federal license.

### I

### *FACTS*

The Federal Power Commission issued a license pursuant to the Federal Power Act, 16 U.S.C. §§ 791a, 797(e), et seq., to Pacific Gas & Electric Company (PG & E) in 1929, to use federal land on the Stanislaus River for a dam, reservoir and plant to generate electricity. The license would by its express terms expire June 1, 1977. This was then called the Melones dam and reservoir, and subsequently became known as the Old Melones hydroelectric project.

In 1944, Congress authorized a new and bigger project at the same site, called "New Melones." Flood Control Act of 1944, P.L. No. 78–534. Even though it was authorized and planned, this New Melones project was not funded or built in the 1940's. In the 1950's, the irrigation districts nearby arranged with PG & E to assist them in building three dams separate from the Melones

project. To enhance its ability to get long term financing, PG & E sought to extend its license on Old Melones. The Federal Power Commission was willing to do that, but sought to protect its flexibility in case it ever got the money from Congress to build New Melones, still languishing in file folders since 1944.

The Federal Power Commission accomplished these objectives by issuing a new license in 1955 that extended PG & E's 1929 license termination from 1977 to 2005, but contained a proviso that if the government condemned the license, it would have to pay only as much as it would have paid under the earlier license with a 1977 termination date.[1]

New Melones was reauthorized and funded in 1962. Flood Control Act of 1962, Pub.L. No. 87-874. On July 8, 1976, fourteen years after the New Melones Project was reauthorized and 10½ months before PG & E's license for the Old Melones Project would have expired, the United States filed a declaration of taking, by which it acquired land surrounding the PG & E plant. The taking cut off the water supply for Old Melones, rendering it worthless except for salvage.

The only issue in this case is how much money the government owes to PG & E as just compensation. PG & E initially claimed $102 million. This was based on an appraisal completed by PG & E's expert's analyzing fair market value between a willing buyer and a willing seller, assuming that the license had been renewed and the government was not condemning PG & E's property. Basically, PG & E's expert used the present value of a sixty year stream of income to determine what Old Melones would have been worth, had it not been condemned.

The United States took the position that just compensation was only $1.3 million. This valuation was based on the assumption that the license would not be renewed, so compensation should be for the value of PG & E's interest under a license expiring in 1977. The parties stipulated that the government's $1.3 million deposit at the time of the taking was the value of the 10½ months PG & E had left on its license plus the salvage value of the plant at the time of the taking.

The district court granted summary judgment in favor of the government. PG & E argues that it is entitled to compensation for Old Melones, taking into account the money Old Melones would have made had it not been condemned, and considering the likelihood that its license would have been renewed had New Melones not gone ahead. Under the case as it stands, PG & E got what its remaining 10½ months was worth, plus the salvage value of its plant, but got no compensation for the money Old Melones would have generated had its license been renewed. PG & E submitted evidence that hydropower licenses of this sort were usually renewed, so a buyer would pay something which accounted for the high likelihood of renewal.

The district court excluded from the evidence on the summary judgment motion PG & E's proffered appraisal, on the ground that it did not comply with the court's instructions on assumptions to be used. The excluded appraisal evaluated fair market value as $53 million. The appraiser generated this figure based on assumptions that even if PG & E could not get the license renewed, a buyer would estimate a substantial probability that it could use the water rights from Old Melones, put together a development project for New Melones, and get a federal license for a non-federal New Melones project, and there-

---

1. The 1955 license contains this language:

Article 36. In the event the existing Melones development of the Licensee shall be taken over in whole or in part or impaired or damaged by the United States in connection with the construction, operation or maintenance by the United States of a New Melones Reservoir (authorized by Section 10 of the Act of December 22, 1994 [58 Stat. 887, 901] for construction by the Corps of Engineers) the compensation to which the Licensee shall be entitled for any such taking by the United States shall be no more up to June 1, 1977 (former expiration date of the license for Project No. 708) than it would have been entitled to under the license for Project No. 708.

The parties do not now dispute the proposition that this meant PG & E could not claim any more damages in the event of a taking of its Old Melones Plant for the New Melones project than it would have been entitled to if its license expired in 1977, pursuant to the 1929 license.

fore would pay much more for Old Melones than salvage and 10½ months of income.

## II

### *ANALYSIS*

■■■■ We review the grant of summary judgment *de novo*. *Jesinger v. Nevada Federal Credit Union*, 24 F.3d 1127, 1130 (9th Cir.1994). We review exclusion of evidence for abuse of discretion. *United States v. 57.09 Acres of Land*, 757 F.2d 1025, 1027 (9th Cir.1985).

■■ PG & E argues for an award of the value of an expectancy that its license would be renewed on the basis of *Almota Farmers Elevator & Warehouse Co. v. United States*, 409 U.S. 470, 93 S.Ct. 791, 35 L.Ed.2d 1 (1973). The United States took Almota's grain elevator, which was on land leased from a railroad. The government proposed to pay for the value of the elevator assuming Almota would lose its right to use the property when the lease expired in 7½ years. Almota offered proof that, were it not for the condemnation, a willing buyer would pay something additional for the expectation that the railroad would renew the lease. The Court noted that an existing tenant usually has the inside track for a renewal, the landlord has an interest in keeping its property leased, and the government "may not take advantage of any depreciation in the property taken that is attributable to the project itself." *Id.* at 478, 93 S.Ct. at 796. The concurring Justices pointed out that Almota had agreed to bear the risk that the railroad would change its plans, but not that the government would condemn the property for another use. *Id.* at 479, 93 S.Ct. at 797. The Court therefore held affirmatively, on the question of, "[w]hether, upon condemnation of a leasehold, a lessee with no right of renewal is entitled to receive as compensation the market value of its improvements without regard to the remaining term of its lease, because of the expectancy that the lease would have been renewed." *Id.* at 473, 93 S.Ct. at 794.

On the same day *Almota* came down, the Supreme Court went the other way in *United States v. Fuller*, 409 U.S. 488, 93 S.Ct. 801, 35 L.Ed.2d 16 (1973). In *Fuller*, a rancher raised cattle on land, different parts of which he owned in fee simple, leased from the state, and licensed from the federal government under revocable Taylor Grazing Act permits. The federal government condemned some of the fee simple land. The dispute was over whether fair compensation for the fee simple land should include the increased value of the fee land on account of the grazing permits. The grazing permits of course increased the practicality of raising cattle on the fee lands. The Court held that the government did not have to "pay for that element of value based on the use of respondent's fee lands in combination with the Government's permit lands." *Id.* at 493, 93 S.Ct. at 805. The principle was that "the Government as condemnor may not be required to compensate a condemnee for elements of value that the Government has created, or that it might have destroyed under the exercise of governmental authority other than the power of eminent domain." *Id.* at 492, 93 S.Ct. at 804. The Court expressly notes that "[w]e do not suggest that such a general principle may be pushed to its ultimate logical conclusion." *Id.*

We conclude that *Fuller*, not *Almota*, supplies the proper resolution to the case at bar. In *Almota*, the interest which the tenant did not own, but which generated value for which the tenant should be compensated, was owned privately. In *Fuller* and in the case at bar, the interest generating the disputed value is owned by the condemning authority. It is one thing for the market to value the probability that a third party will exercise its liberty in a particular way and make the government pay for that market value, but quite another to make the government pay for its own contractually preserved right to do as it chooses.

The 1955 license expressly tied the right to be compensated for an early termination to PG & E's rights under the 1929 license, which ended in 1977. PG & E owned the right to generate hydroelectric power, or get compensated for the taking of that right, until June of 1977. The United States owned the right to use its lands as it chose, even if it destroyed the value of PG & E's interest, after that date. The termination date in the

1929 license preserved that right to the government. To hold that PG & E could recover money for the expectation that the government would have renewed its license after 1977, " 'would be to create private claims in the public domain.' " *Fuller,* 409 U.S. at 493, 93 S.Ct. at 805. The government's position in the case at bar is analogous to the railroad's position in *Almota,* not the government's. A third party would pay Almota for the value of the expectation that the railroad would renew the lease, but the railroad would not have to buy from Almota the right to evict Almota when the lease ran out; it already owned that right.

■ PG & E's argument that it could expect the government to want to renew a license which generated domestic, nonpolluting power confuses a political prediction with a property right. Federal energy policy shifted significantly between 1929, when PG & E was licensed to operate the Old Melones Plant, and 1977, when the right to compensation under the license expired. PG & E protected the value of its investment against policy changes by securing a 48 year license. After half a century, the government was free to change its policy, and had indicated its intention to do so by funding New Melones. PG & E's expectation based on its property rights expired in 1977, regardless of the political reasonableness of its hopes and expectations subsequent to that date. "Expectations reasonably based upon constitutionally protected property rights are protected against policy changes by the Fifth Amendment. Those based only on economic and political predictions, not property rights, are not protected." *Madera Irrigation District v. Hancock,* 985 F.2d 1397, 1400 (9th Cir.1993).

Though we have not found a case in which this court applied *Almota* or *Fuller* in precisely analogous circumstances, our prior decisions likewise suggest that the case at bar should be treated like *Fuller.* In *Ryan Outdoor Advertising, Inc. v. United States,* 559 F.2d 554 (9th Cir.1977), billboard companies sued the government for refusing to renew revocable permits, after government policies had changed to restrict billboards on federal lands. We rejected their inverse condemna-

tion claim under *Fuller,* because, once their permits were revoked or expired, "[t]here was no longer any interest to be compensated." *Id.* at 557.

Likewise, in *United States v. 5.96 Acres (Knappton Towboat),* 593 F.2d 884 (9th Cir. 1979), we held that the government did not have to pay for damage to Knappton's pilings and dikes in the river when the government's dam enlargement destroyed them, because Knappton built them pursuant to permits revocable at will and "has no property interest cognizable under the Fifth Amendment," *Id.* at 887–88, following *Fuller* and *Ryan Outdoor Advertising.*

■ PG & E argues that the condemnation award cannot be reduced based upon decrease in market value attributable to the government project which causes the award. *United States v. Reynolds,* 397 U.S. 14, 16, 90 S.Ct. 803, 805, 25 L.Ed.2d 12 (1969); *United States v. Virginia Electric & Power Co.,* 365 U.S. 624, 636, 81 S.Ct. 784, 792, 5 L.Ed.2d 838 (1963). The principle is right, the application wrong. The government cannot pay less for *another's* property, where the value is reduced by the project necessitating the taking. *See, e.g., United States v. Weyerhaeuser Co.,* 538 F.2d 1363, 1367 (9th Cir.1976). But the government does not have to buy from a condemnee the right to use government property which is unencumbered by a property interest of the condemnee.

PG & E's argument that the district court should have admitted the appraisal necessarily fails because PG & E was entitled to no compensation for the government's use of federal lands after the right to compensation under the license expired. Exclusion of the report was therefore not an abuse of discretion.

AFFIRMED.