153 F.3d 938
 1998-2 Trade Cases P 72,237, 98 Cal. Daily
Op. Serv. 6428,
98 Daily Journal D.A.R. 8897
PORTLAND 76 AUTO/TRUCK PLAZA, INC., Plaintiff-Appellant,
v.
UNION OIL COMPANY OF CALIFORNIA, dba Unocal Corporation;
National Auto/Truckstops Incorporated, Defendants-Appellees,
and
Gordon A. Barron, Jr.; Joan L. Barron,
Counter-Defendants-Appellants.
PORTLAND 76 AUTO/TRUCK PLAZA, INC., Plaintiff-Appellee,
v.
UNION OIL COMPANY OF CALIFORNIA, dba Unocal Corporation,
Defendant-Appellant,
and
National Auto/Truckstops Incorporated; William Osborne;
Paul Kohler, Defendants.
 Nos. 95-35543, 95-36022.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Nov. 5, 1996.
Decided Aug. 19, 1998.
 
 Jeffrey M. Batchelor, Lane Powell Spears Lubersky LLP, Portland, Oregon, for defendant-appellee, cross-appellant.
 John J. Dunbar (Argued) and Bruce M. Hall (Argued), and Kathryn D. Whittaker (On the Briefs), Ball, Janik & Novack, Portland, Oregon, for plaintiff-appellant, and cross-appellee.
 Appeals from the United States District Court for the District of Oregon; John Jelderks, Magistrate Judge, Presiding. D.C. Nos. CV-92-01635-JJ, CV-92-01635-JAJ.
 Before: CANBY, RYMER and KLEINFELD, Circuit Judges.
 KLEINFELD, Circuit Judge:
 
 
 1
 A fuel wholesaler improved one leased truck stop less than others. Did this violate the Robinson-Patman Act, 15 U.S.C. § 13 et seq., or Petroleum Marketing Practices Act, 15 U.S.C. § 2801 et seq.? The lease? The Robinson-Patman Act issue turns out to be especially difficult.
 
 I. FACTS
 
 2
 Unocal made two agreements with Portland 76, in 1978. It leased a truck stop in Oregon to Portland 76, and contracted to sell Portland 76 motor fuel for resale. The lease in effect at the times relevant to most of the issues in this case ran from April 1, 1991 to February 28, 1994. No option to renew was included in the lease, and it provided for automatic expiration without notice February 28, 1994. The truck stop became seedy over the years. More attractive and convenient truck stops, including Unocal truck stops, could better attract truck drivers to pull in. Portland 76's theory of the case was that Unocal should have improved the truck stop commensurately with other Unocal truck stops, and in letting it go downhill, breached both its lease obligations and its Robinson-Patman duty not to discriminate among the retailers to whom it sold fuel.
 
 
 3
 The lease included an extraordinarily detailed allocation of maintenance responsibilities. In addition to a general statement of responsibilities for cleaning, maintenance and replacement, the lease included an 18 page table specifying whether Unocal or Portland 76 was responsible for cleaning, maintenance or replacement of such items as "yard sign & lighting," light bulbs for the sign on the highway, even the hot chocolate dispensers in the restaurant. In general, the lease required Portland 76 to clean and do light maintenance, Unocal to do heavy maintenance and replacement of equipment. The lease did not require either party to make improvements. Portland 76 was not permitted to make permanent modifications without Unocal's written consent.
 
 
 4
 Though the lease did not entitle Portland 76 to any improvements, as a practical matter Unocal sometimes made them. Its money, after all, came from fuel sales, not just rent. Portland 76 asked Unocal to improve the truck stop much more than it did, and expressed concern to Unocal about losing market share to better facilities. Some evidence suggested that the truck stop had been badly designed and built by Unocal years earlier. Unocal and Portland 76 together planned such improvements as converting some motel rooms to conference and training rooms, redesigning the convenience store, improving fuel pumping rates, putting in a day care center, and expanding the shower and laundry facilities. A number of planned improvements were never made.
 
 
 5
 As the Portland 76 truckstop deteriorated, Unocal improved competing truckstops. The evidence showed that big trucks had a fuel range of 1,600 to 1,800 miles on a tank, so Portland 76, near Portland, was competing with truck stops as far away as Northern California. Portland 76 proved that Unocal spent much more money between 1987 and 1990 renovating and upgrading its truckstops in Redding, Sacramento, and Santa Nella, California, than on the Portland 76 truckstop.
 
 
 6
 The difference in expenditures was disproportionate to the amounts of fuel sold or rent paid at the various truckstops. The California truckstops sold more fuel, but less than twice as much, yet Unocal's improvement expenditures were well over twice as much during 1987-90. Likewise, the rent on the California truckstops was less than twice the rent on Portland 76.
 
 
 7
 Portland 76's market share declined relative to the California Unocal truckstops. All the Unocal truckstops had decreased sales for the relevant period, but evidence suggested that part of Portland 76's sales decline was attributable to its facility becoming less attractive relative to the other Unocal facilities. The jury heard that the truckstop's highway signs needed to be replaced, the roof leaked in the restaurant, the showers were in bad condition, the heating and air conditioning in the restaurant were inadequate, the parking lot was full of potholes, the sewage system stank on hot days, and the fuel lanes were too narrow.
 
 
 8
 Unocal got out of the truckstop business in 1993. It sold its truckstops, including Portland 76, to National Auto/Truckstops, and assigned Portland 76's lease. National and Portland 76 agreed that National would sell it fuel, and Portland 76 made a new lease with National, in December 1993, effective upon the expiration of the Unocal agreements (though Portland 76 signed under protest).
 
 
 9
 Portland 76's claims against Unocal went to jury trial. The jury found that Unocal breached its lease, causing $1 million in damages by the end of the term. In addition, the jury found that Unocal violated the Robinson-Patman Act in connection with the furnishing of facilities, causing the same $1 million damages as the lease violations, plus another $1,307,440 not included in the lease damages. That is, Portland 76 lost $1 million because of things Unocal was obliged to do both under the lease and under the Robinson-Patman Act, and lost another $1,307,440 because of things Unocal was not obliged to do under the lease, but was under the Act. The sum of the two damages items was trebled, pursuant to 15 U.S.C. § 15, to almost $7 million.
 
 
 10
 Though the case went to a jury, a number of issues were resolved as a matter of law. Portland 76's Petroleum Marketing Practices Act claims were dismissed on summary judgment. Also, the court determined as a matter of law that neither the Robinson-Patman Act damages nor lease damages could accrue beyond the end of Portland 76's lease.
 
 
 11
 Both sides have appealed. Portland 76 appeals the limitation on damages to the lease period, and dismissal of the Petroleum Marketing Practices Act claim. Unocal appeals the decision to allow the Robinson-Patman Act claim to go to the jury at all. Under Unocal's theory, improvements to realty leased by the seller to the buyer should not be treated as discrimination in the furnishing of facilities under 15 U.S.C. § 13(e).
 
 II. ANALYSIS
 A. Robinson-Patman Act Claims
 
 12
 The most difficult issue in this case is whether the Robinson-Patman Price Discrimination Act applies to the truck stop as a "facility." Portland 76 won its verdict on the theory that it does, but Unocal argues that as a matter of law, it does not.
 
 
 13
 The Robinson-Patman Act generally makes it unlawful for a wholesaler to discriminate in price between different purchasers of similar commodities, subject to a number of exceptions and to a qualified exception relating to quantity. 15 U.S.C. § 13(a). Obviously a clever wholesaler wishing to discriminate could evade a simple command by keeping the nominal price the same for everyone, but offering better terms to favored customers. And more powerful customers could, if permitted, pressure a wholesaler to do that. Several subsections of the statute deal with disguised discounts, such as commissions, benefits to customers, and provision of services and facilities. 15 U.S.C. §§ 13(c), (d), (e).
 
 
 14
 Portland 76 sued for disguised price discrimination by discriminatory provision of "facilities," which the statute prohibits:
 
 
 15
 It shall be unlawful for any person to discriminate in favor of one purchaser against another purchaser or purchasers of a commodity bought for resale, with or without process, by contracting to furnish or furnishing, or by contributing to the furnishing of, any services or facilities connected with the processing, handling, sale, or offering for sale of such commodity so purchased upon terms not accorded to all purchasers in proportionally equal terms.
 
 
 16
 15 U.S.C. § 13(e).
 
 
 17
 1. Statutory language.
 
 
 18
 Ordinarily we begin with the language of the statute. The statutory language can be read to treat a leased truck stop as a "facility," as Portland 76 successfully claimed in district court. Reading it to include leaseholds, however, would put us in conflict with the two other circuits who have considered the question, and would expand the statute far beyond its established administrative construction. Because a possible literal reading conflicts with the well established reading, and because the language is extremely general and subject to different constructions, the issue of how to construe the statutory language is difficult.
 
 
 19
 Portland 76 was a "purchaser" in the sense of the statute, of a "commodity bought for resale," fuel for trucks. Its theory was that Unocal furnished "facilities connected with the ... sale" of the fuel "upon terms not accorded to all purchasers on proportionally equal terms," because some truck stops leased from Unocal received improvements to their facilities that were far more than proportional to the relative amounts of fuel they sold. The district court adopted this theory, by denying a motion for judgment as a matter of law, and instructing the jury that what Portland 76 had to prove was that "Unocal discriminated against it in favor of at least one other Unocal-franchised truck stop through Unocal's furnishing of any facilities connected with the resale of fuel to customers."
 
 
 20
 Is leased real estate a "facility" in the sense of the statute? Arguing in favor, "facilities" is a broad and general term, and a truck stop is "connected with" the sale of fuel to truckers. Arguing against is an instinct that the magistrate judge gave voice to, that it does not make sense for someone who rents a Chevrolet to demand a Cadillac. Can a tenant agree to a lease provision that the landlord does not have to do something, and then if the landlord does it for another truck stop operator, insist that the landlord do what they had agreed the landlord did not have to do? No one would be able to rent an old, run down truck stop cheap, if the landlord had to do substantially more than the lease required to comply with the Robinson-Patman Act. Nevertheless, if the statutory command were plain from its language, that would be the end of the discussion.
 
 
 21
 The statutory phrase refers to discrimination in "contracting to furnish or furnishing ... services or facilities connected with the processing, handling, sale, or offering for sale of such commodity so purchased." 15 U.S.C. § 13(e). Did Congress address leasing of realty in the phrase "contracting to furnish ... facilities connected with ... sale"? Leases were spoken of in the 1930's, more than they are now, as conveyances of non-freehold estates in land (chattels real), not merely as contracts, though they had contractual aspects as well. Moynihan, Introduction to the Law of Real Property 70 (1962) ("courts, for the most part, have refused to apply modern principles of contract law to leases"); Cribbett, Fritz & Johnson, Property--Cases and Materials 335 (2d ed. 1966). "But the law as to leases is not a matter of logic in vacuo; it is a matter of history that has not forgotten Lord Coke." Gardiner v. William S Butler & Co., Inc., 245 U.S. 603, 605, 38 S.Ct. 214, 62 L.Ed. 505 (1918) (Holmes, J.). Considering what the words connoted when Congress used them, it is questionable whether "contracting to furnish facilities" included leased realty.
 
 
 22
 On the other hand, were the word "facilities" to be defined simply by substituting a general dictionary definition for the term in the statute, it might well include realty leased by a wholesaler to a retailer for sale of the wholesaled goods. The word has been defined as "A thing that promotes the ease of any action, operation, transaction, or course of conduct; advantage; opportunity;--usually in pl.; as, special facilities for study." Webster's New International Dictionary 908 (2d ed. 1943). A more recent dictionary definition is "something (as a hospital, machinery, plumbing) that is built, constructed, installed, or established to perform some particular function or to serve or facilitate some particular end." Webster's New International Dictionary 812-13 (3d ed. 1981).
 
 
 23
 The Supreme Court ruled upon various Robinson-Patman issues, but without expressly construing the statutory term "facilities" in Federal Trade Comm. v. Simplicity Pattern Co., Inc., 360 U.S. 55, 79 S.Ct. 1005, 3 L.Ed.2d 1079 (1959). The Court applied the "services," "facilities" and "terms" provisions to the different arrangements a manufacturer of clothing patterns used in sales to variety stores and to fabric stores. The variety stores bought on consignment, the fabric stores for cash; the variety stores got several things free that the fabric stores had to pay for--metal cabinets to hold the patterns, catalogs, and transportation costs. In a footnote, the Court mentioned other "services and facilities" furnished to the fabric stores but not the variety stores: traveling demonstrators, promotional posters, instructional brochures for merchants, and monthly publications. Id. at 61 n. 4, 79 S.Ct. 1005. Though the Court did not expressly construe the term "facilities," the examples are suggestive of what the Court understood the term to mean.
 
 
 24
 We have never held one way or the other whether leased premises can be "facilities." We said in dicta, in Standard Oil Company of California v. Perkins, 396 F.2d 809, 814 (9th Cir.1967), reversed on other grounds, 395 U.S. 642, 89 S.Ct. 1871, 23 L.Ed.2d 599 (1969), that a fuel wholesaler was obligated to "make the same proportional payments and allowances to Perkins for such items as service station rest room maintenance, painting of service stations, advertising and credit card privileges, as it did to the Branded Dealers." The remark may have been addressing allowances to firms operating service stations they owned themselves or leased from third parties, as opposed to stations leased from the fuel wholesaler, because the opinion does not say that the dealers were operating gas stations leased from the fuel wholesaler. The issue raised in Perkins was whether the disguised discount prohibition applied to paying branded dealers but not independents allowances for cleaning their own rest rooms. That is a different issue from whether premises leased from the wholesaler are "facilities" for purposes of the Act. We mentioned "facilities" in Purdy Mobile Homes, Inc. v. Champion Home Builders Co., 594 F.2d 1313 (9th Cir.1979), but only in the context of whether selling identical mobile homes to a competing retailer but not the franchisee was "discrimination" in the Robinson-Patman sense; leased realty was not at issue.
 
 
 25
 Two other circuits have held that leased real estate cannot be a facility for purposes of the Robinson-Patman Act. The Sixth Circuit has held that "The Act is not concerned with ... a lease of realty." Export Liquor Sales, Inc. v. Ammex Warehouse Company, 426 F.2d 251, 252 (6th Cir.1970). The Fourth Circuit likewise held that real estate leases are not "facilities" for purposes of the Robinson-Patman Act prohibition. Hinkleman v. Shell Oil Company, 962 F.2d 372, 380 (4th Cir.1992).
 
 
 26
 The Sixth Circuit decision does not say why leased realty is not "facilities connected with the ... sale ... of such commodity," in the sense intended by 15 U.S.C. § 13(e). The Fourth Circuit explains that service stations "do not actively promote the resale of gasoline" but "merely facilitate ... resale." Hinkleman, 962 F.2d at 380. We are not sure of the tenability of the Hinkleman distinction between active promotion and mere facilitation, but regardless, it is significant that two circuits have ruled that leased real estate cannot be "facilities" and none have ruled that it can be. Because of the importance of predictability to commercial relations, as well as deference to our sister circuits, we shall not lightly create an intercircuit conflict affecting commerce nationally.
 
 
 27
 What is troubling about treating realty leased from the wholesaler as "facilities" for purposes of the Act is that Unocal and Portland 76 had two commercial relationships, not merely one. In their relationship as wholesaler and purchaser of fuel for resale, Unocal was prohibited by law from discriminating in the furnishing of facilities. But in their relationship as landlord and tenant, Unocal was selling something unique, a possessory interest in particular real estate, rather than something fungible, fuel. The word "discriminate" connotes treating like objects differently, so it is hard to apply the word to the leasing of real estate, ordinarily considered unique.
 
 
 28
 2. Legislative history.
 
 
 29
 Even if we were prepared to treat legislative history as authoritative, we have found no mention in it of whether it was anyone's intention to treat leased realty as "facilities." The legislative history does have some value, though. It tells us what social problem Congress addressed with this statute more than six decades ago. The statute and not the legislative history tells us what solution Congress adopted for the problem, but the legislative history is useful to determine what the problem was. Without the history, it is not immediately apparent what problem that long ago Congress was talking about.
 
 
 30
 It is perfectly plain from the legislative history that "the evil" addressed by the Act was the "Goliath" of "huge chainstores sapping the life of local communities," and oppressing both manufacturers and independent retailers. Remarks of Rep. Wright Patman Introducing H.R. 8442, 79 Cong. Rec. 9077 (1936), reprinted in Legislative History, supra at 2927. See H.R.Rep. No. 2287, Pt. 1, 74th Cong., 2d Sess. (1936), reprinted in The Legislative History of the Federal Antitrust Laws and Related Statutes 3183 (Earl W. Kintner, ed. 1980); Simplicity Pattern Co., 360 U.S. at 69, 79 S.Ct. 1005 (citing e.g., Final Report on the Chain-Store Investigation, S. Doc. No. 4, 74th Cong., 1st Sess. (1935)); Fred Meyer, Inc., 390 U.S. at 350-51, 88 S.Ct. 904; Great Atlantic & Pacific Tea Company v. Federal Trade Commission, 440 U.S. 69, 75-76, 99 S.Ct. 925, 59 L.Ed.2d 153 (1979).
 
 
 31
 Comparable competitive advantages were obtained by the large purchasers in several ways other than direct price concessions. Rebates were induced "for brokerage fees," even though no brokerage services had been performed. "Advertising allowances" were paid by the sellers to the large buyers in return for certain promotional services undertaken by the latter. Some sellers furnished special services or facilities to the chain buyers. Lacking the purchasing power to demand comparable advantages, the small independent stores were at a hopeless competitive disadvantage.
 
 
 32
 Simplicity Pattern, 360 U.S. at 69, 79 S.Ct. 1005. Opposition reflected the theme that "the consumer is made the goat" by depriving him of the efficiencies which competition by national chainstores, and their ability to obtain quantity discounts and pass them on, could bring. H.R.Rep. No. 2287, Pt. 2, 74th Cong., 2d Sess., (1936) (quoting the minority view of Representative Emmanuel Celler), reprinted in, Legislative History, supra at 3201. But the small local retailers prevailed, the chain stores lost.
 
 
 33
 The legislative history of the Robinson-Patman Act makes it abundantly clear that Congress considered it to be an evil that a large buyer could secure a competitive advantage over a small buyer solely because of the large buyer's quantity purchasing ability.
 
 
 34
 Federal Trade Comm'n v. Morton Salt Co., 334 U.S. 37, 43, 68 S.Ct. 822, 92 L.Ed. 1196 (1948).
 
 
 35
 The present subsection (e) attacked "secret discriminations," Simplicity Pattern Co., 360 U.S. at 69 n. 12, 79 S.Ct. 1005, such as disguised advertising and promotional discounts to the chainstores:
 
 
 36
 Still another favored medium for the granting of oppressive discriminations is found in the practice of large buyer customers to demand, and of their sellers to grant, special allowances in the purported payment of advertising and other sales promotional services, which the customer agrees to render with reference to the sellers' products, or sometimes with reference to his business generally. Such an allowance becomes unjust when the service is not rendered as agreed and paid for, or when, if rendered, the payment is grossly in excess of its value, or when in any case the customer is deriving from it equal benefit to his own business and is thus enabled to shift to his vendor substantial portions of his own advertising cost, while his smaller competitor, unable to command such allowances, cannot do so.
 
 
 37
 Section [2(e) ] of the bill addresses this evil by prohibiting the granting of such allowances unless made available to all other customers of the seller concerned on proportionally equal terms, or unless in the rendition of such services the customer's own business is kept out of the picture.
 
 
 38
 H.R.Rep. No. 2287, Pt. 1, 74th Cong., 2d Sess. (1936), reprinted in Legislative History, supra at 3193-94. Examples Representative Patman gave of the disguised price discrimination to be remedied were proportionally unequal "window display services, newspaper lineage, billboard posters," and allowances to have clerks promote a manufacturer's products. Remarks of Rep. Wright Patman Introducing H.R. 8442, 79 Cong. Rec. 9077, reprinted in, Legislative History, supra at 2928.
 
 
 39
 The problem to which Portland 76's theory in the case at bar was addressed is discrimination in rental arrangements. Discrimination against a franchisee as tenant by a franchisor is different from use by chain stores of their market power to force wholesalers to discriminate against small local stores. That is not to say the franchisee problem is not serious, only to say that it is different. The legislative history shows that Congress addressed a different harm from the one Portland 76 suffered. This history is not decisive, but it bears on how the statutory words should be read.
 
 
 40
 3. Administrative interpretation.
 
 
 41
 There is a long established administrative interpretation by the Federal Trade Commission of the Act's prohibition on discriminatory furnishing of services and facilities. Because Congress did not make plain in the statutory language whether the prohibition applied to leased realty, we give "considerable weight" to an agency's interpretation of a statute it is entrusted to administer. Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). The regulation provides a list of "examples--the list is not exhaustive." 16 C.F.R. § 240.7. Here is the entire list of examples:
 
 
 42
 Cooperative advertising;
 
 
 43
 Handbills;
 
 
 44
 Demonstrators and demonstrations;
 
 
 45
 Catalogues;
 
 
 46
 Cabinets;
 
 
 47
 Displays;
 
 
 48
 Prizes or merchandise for conducting promotional contests;
 
 
 49
 Special packaging, or special package sizes.
 
 
 50
 16 C.F.R. § 240.9. The regulations also include a list of examples illuminating "proportionally equal terms," such as promotional allowances. 16 C.F.R. § 240.9.
 
 
 51
 Because the regulation expressly provides that the list is not exhaustive, it cannot be read pursuant to the principle expressio unius est exclusio alterius. Cf. Longview Fibre Co. v. Rasmussen, 980 F.2d 1307, 1312-13 (9th Cir.1992). The list purposely does not exhaust the category of services and facilities with respect to which wholesalers cannot discriminate, because that would invite evasion. The items in the list are helpful, though, as illustrations of "services" and "facilities" as those terms have long been understood by the agency. The terms "services" and "facilities" can be usefully construed in light of the administrative list of examples and the principle ejusdem generis, i.e., of the same kind, and noscitur a sociis, i.e., known by its associates. See United States v. Baird, 85 F.3d 450, 453 (9th Cir.1996). Though lawyers do not learn as much Latin as they used to, there is nothing esoteric about listing a series of examples and considering whether something else is like the things in the list. If a retailer or wholesaler were asked which did not belong in the list--advertising allowances, handbills, demonstrators, catalogues, cabinets, displays, prizes, special packaging, and leased realty--almost everyone would pick out leased realty as being different. Thus the long established administrative interpretation shows an understanding that leased realty is not "facilities" in the statutory sense.
 
 
 52
 4. Conclusion.
 
 
 53
 In sum, we have a word, "facilities," in the statute, that might be read to include leased realty or not. The dictionary definitions suggest inclusion, but the historical context, constructions by other circuits, and the administrative construction, all indicate that something narrower is intended.
 
 
 54
 It has long been understood that a word in a statute cannot be understood simply by substituting for the word its dictionary definition. Justice Holmes explained that, even though the dictionary definition of "vehicle" might include airplanes, the usage in a federal vehicle theft act--"automobile, automobile truck, automobile wagon, motor cycle, or any other self-propelled vehicle not running on rails"--did not, because of the connotations of everyday speech and the limitations implied by the list of examples. McBoyle v. United States, 283 U.S. 25, 51 S.Ct. 340, 75 L.Ed. 816 (1931).
 
 
 55
 One oft-noted reason why dictionary definitions cannot be substituted mechanically for words in a statute are that there are too many dictionary definitions per word. Cf. United States v. Foster, 133 F.3d 704 (9th Cir.1998), overruled sub silentio, Muscarello v. United States, --- U.S. ----, 118 S.Ct. 1911, 141 L.Ed.2d 111 (1998). Another is that dictionary definitions conventionally are intensional rather than extensional. An intensional definition describes the properties a thing must have to be characterized by the word. By contrast, an extensional definition lists the things the word designates. See Wesley C. Salmon, Logic 90-91 (1963). Cases, regulations, and legislative history work something like an extensional definition, illustrating a number of things the word designates, and suggesting that it also includes other things like the ones listed. There is no logical reason to say that the definition of a word is its intensional definition, as opposed to its extensional definition; its definition is both, and both are hard to do right.
 
 
 56
 Any intensional definition, which is to say, any conventional dictionary definition, is likely to be too broad or too narrow, in the context of a particular statute. It will frequently embrace more than the legislature meant to include. And any extensional definition is likely to be too narrow, because clever evaders will always invent ways to achieve the forbidden purpose that the legislature did not think of. Use of an intensional identification of what the statute prohibits, narrowed by extensional identification of examples, is a common sense way to apply the statute to what the words in context mean. Though the terms "intensional" and "extensional" are not much used in everyday speech, ordinary speech is full of general definitions followed by "for example" lists.
 
 
 57
 A lease of a truckstop is not like a display cabinet for paper dress patterns, Simplicity Pattern Co., 360 U.S. at 60, 79 S.Ct. 1005, an extra sales clerk to push a brand of cosmetics in a department store, Elizabeth Arden Sales Corp. v. Gus Blass Co., 150 F.2d 988, 994 (8th Cir.1945), or mailings to prospective customers advertising certain product lines, Zwicker v. J.I. Case Co., 596 F.2d 305, 310 (8th Cir.1979) (construing § 13(d)). Nor is a franchisor's leasing of a truckstop to its franchisee like a wholesaler's payment of a retailer's rent to a third party. See George Haug Co., Inc. v. Rolls Royce Motor Cars Inc., 148 F.3d 136, 144 (2d Cir.1998). Among the differences is what caught the eye of the Fourth and Sixth Circuits--the truckstop is realty leased from the wholesaler. Because realty leased by the wholesaler to the retailer is so different from what the words "services and facilities" have meant in the statute, we conclude that it is not a "facility" in the sense of the statute.
 
 
 58
 Accordingly, we conclude that realty leased to a purchaser of goods for resale, by the party that sells the goods to that purchaser, is not "facilities connected with" the sale in the sense of the Robinson-Patman Act. That leads to the conclusion that the portion of the jury verdict awarding damages for Robinson-Patman Act violations based on Unocal's having discriminated against Portland 76 in providing services and improvements to the real estate must be vacated. Unocal is correct in its argument that it was entitled to judgment as a matter of law that the Robinson-Patman Act did not allow damages for discrimination in the provision of realty, even if the leased realty was used to sell the goods purchased from the landlord for resale at the realty.
 
 B. Lease Damages
 
 59
 1. Sufficiency of evidence.
 
 
 60
 Portland 76 argued that the jury ought to award $2,355,000 in damages for breach of Unocal's obligations under the lease. The jury in its special verdict awarded $1 million for damages caused by breach of the lease, and $2,307,440 caused by violation of the Robinson-Patman Act (the jury wrote that $1,307,440 of this figure was not included in the breach of lease damages, and $1,000,000 was).
 
 
 61
 Unocal appeals this award on the ground that there was insufficient evidence for the jury to reach it. The argument is that Portland 76's expert witness did not segregate the lease damages from the Robinson-Patman damages, so neither could the jury. Unocal correctly argues that it was the plaintiff's burden to put on proof from which the jury could ascertain damages with reasonable certainty. See Vonravensberg v. Houck-Carrow Corp., 60 Or.App. 412, 653 P.2d 1297, 1299-1300 (1982).
 
 
 62
 It is true that the expert witness did not segregate the damages. He gave the jury the bottom line from a spreadsheet he prepared projecting his estimate of the financial loss from failure to "improve, renovate, and do more maintenance" at the truck stop. He did not give two projections, one based on what the lease covered, and another based on proportional improvements to other Unocal truckstops. The jury could not have used any bottom line from this expert witness as its damages figure.
 
 
 63
 The trial judge denied the motion for judgment because in his view the jury had before it other evidence from which it could rationally segregate the damages. Also, he concluded, the jury had sufficient data so that it could calculate damages without the assistance of an expert. The lease is extremely detailed with respect to what Unocal was obligated to do, and the jury was instructed that the "lease does not provide that Unocal is required to remodel, upgrade or improve the entire truckstop facility or any component part, other than as provided in Exhibit C to the lease." The judge was within his discretion in evaluating the evidence as sufficient to go to the jury on damages. That the jury did segregate damages is apparent from its having awarded $1,304,440 less for breach of the lease than for non-lease Robinson-Patman damages. The jury may have used a different theory from the one plaintiff's expert witness used to calculate the damages. Though necessarily an estimate (as any expert's opinion would have had to have been), the award was not excessively speculative. Cf. State Highway Commission v. Central Paving Co., 240 Or. 71, 76-77, 399 P.2d 1019, 1023 (1965); Valley Inland Pacific Constructors, Inc. v. Clackamas Water District No. 2, 43 Or.App. 527, 533, 603 P.2d 1381, 1386 (1979).
 
 
 64
 2. Termination of damages.
 
 
 65
 The trial judge held that as a matter of law, the jury could not award damages for Unocal's breaches of its lease obligations, to the extent that such damages might have accrued after the end of the lease. Portland 76 argues that this was mistaken, because damages were foreseeable subsequent to the lease period. Portland 76 argues that Harold Schnitzer Properties v. Tradewell Group, Inc., 104 Or.App. 19, 799 P.2d 180 (1990), and Vonravensberg v. Houck-Carrow Corp., 60 Or.App. 412, 653 P.2d 1297 (1982), so hold.
 
 
 66
 The trial judge was correct. Harold Schnitzer Properties is irrelevant, because it is an appeal from an arbitration award, and the court held that arbitrators have the power to decide the law and act within their authority even if they apply the law erroneously. Vonravensberg is also irrelevant, because it is a tort action against a third party, not an action by a tenant against its landlord for breach of the lease.
 
 
 67
 A third party is not necessarily entitled to take advantage of a landlord's right to end a lease, where it is foreseeable that the landlord will renew the lease. That is the proposition supported by Vonravensberg. But a landlord is entitled to take advantage of its own lease provision providing a termination date to the tenant's right to possess the property and profit from possession. Unocal's duties to Portland 76 regarding the real estate ended when the lease ended. Leaseholds that end do not, by their very nature, bind the parties indefinitely. United States v. 42.13 Acres of Land, 73 F.3d 953, 956 (9th Cir.1996). We held in an analogous case that a landlord does not have to "pay for its own contractually preserved right to do as it chooses":
 
 
 68
 It is one thing for the market to value the probability that a third party will exercise its liberty in a particular way, and make [a defendant] pay for that market value, but quite another to make [the defendant] pay for its own contractually preserved right to do as it chooses.
 
 
 69
 42.13 Acres of Land, 73 F.3d at 956.
 
 
 70
 Portland 76 argues that because Unocal failed to perform its maintenance duties under the lease, it began its relationship with its new landlord, National, with an inferior facility, and that led to subsequent damages, citing Arnott v. American Oil Co., 609 F.2d 873, 887 (8th Cir.1979). Arnott does involve a lease by the defendant to the plaintiff, but is not in point, because the theories upon which damages for the period subsequent to the lease were awarded were fraud, breach of fiduciary duty, and price fixing in violation of antitrust laws, not breach of the lease. Unocal had no duty under its lease with Portland 76 to ensure that Portland 76's next lease with a different lessor was of a particular grade of facilities.
 
 C. Petroleum Marketing Practices Act
 
 71
 Portland 76 claimed damages for violations of the Petroleum Marketing Practices Act, 15 U.S.C. §§ 2801-06. The theory was that Unocal had constructively terminated Portland 76's franchise by (1) assigning the lease and franchise to National, because National charged more for fuel, on worse terms; (2) Unocal failed to give required notice of termination; and (3) Unocal was responsible for nonrenewal because National conditioned renewal on payment of a fee that Unocal had not required. The trial judge granted Unocal's motion for summary judgment on these claims, and Portland 76 appeals.
 
 
 72
 Portland 76 did not go out of business when Unocal assigned its franchise to National. Its franchise continued with the assignee, National. It claims constructive termination. We assume for purposes of discussion, but do not decide, that constructive termination may give rise to a claim under the Act. See Little Oil Co., Inc. v. Atlantic Richfield Co., 852 F.2d 441, 444 n. 4 (9th Cir.1988).
 
 
 73
 For the assignment to have amounted to a constructive termination, it would have had to force Portland 76 out of its business, either by breaching Unocal's underlying franchise obligations, or violating state law. Cf. May-Som Gulf, Inc. v. Chevron U.S.A., Inc., 869 F.2d 917, 922 (6th Cir.1989). The assignment did not force Portland 76 out of business. It stayed in business until the time came for renewal.
 
 
 74
 Nor did the assignment violate Oregon law. Under Oregon law, "all rights of either seller or buyer can be assigned except where the assignment would materially change the duty of the other party, or increase materially the burden or risk imposed on the other party by the contract." Or.Rev.Stat. 72.2100(2). Portland 76 established no genuine issue of fact as to whether, as it claimed, the assignment materially increased its burdens. The increased franchise fee was for renewal in 1994, not on the franchise assigned, and the franchise assigned had no provision prohibiting such a fee on renewal. The increased prices for fuel and worse terms on such items as credit card fees were not contrary to the Unocal franchise. Though National increased Portland 76's burdens, the assignment did not. Portland 76 argues that National breached its lease by continuing to allow the real estate to deteriorate, but that was not caused by the assignment.
 
 
 75
 Portland 76 argues that when Unocal assigned the Portland 76 franchise to National, it knew National would subsequently demand terms and prices "not in response to changing market conditions or consumer preferences" but rather charged more because of its own financial needs. The statute does not say that a franchisor has to limit changes in its prices and terms to "response to changing market conditions or consumer preferences." The statute says changes must be "in good faith and in the normal course of business." 15 U.S.C. § 2802(a)(3)(A)(i). Portland 76's standard for changes is based, not on the statutory language, but on a remark in a Senate Report that franchisors needed flexibility "to respond to changing market conditions and consumer preferences":
 
 
 76
 Legislation in this subject area requires recognition of the legitimate needs of a franchisor to be able to terminate a franchise or not renew a franchise relationship based upon certain actions of the franchisee, including certain failures to comply with contractual obligations or upon certain changes in circumstances. Particularly important is that legislation dealing with this subject recognize the importance of providing adequate flexibility so that franchisors may initiate changes in their marketing activities to respond to changing market conditions and consumer preferences.
 
 
 77
 S.Rep. No. 731, 95th Cong., 2d Sess. 19 (1978), reprinted in 1978 U.S.C.C.A.N. 873, 877. The statute states the standard, and this argument for flexibility does not change it. We have held that a franchisor meets the statutory good faith requirement "so long as the franchisor does not have a discriminatory motive or use the altered terms as a pretext to avoid renewal":
 
 
 78
 Courts have construed [15 U.S.C. § 2802(b)(3)(A) ] as precluding judicial second-guessing of the economic impact of an otherwise legitimate business decision by the franchisor. So long as the franchisor does not have a discriminatory motive or use the altered terms as a pretext to avoid renewal, the franchisor has met the burden required by the PMPA for determining good faith.
 
 
 79
 Valentine v. Mobil Oil Corp., 789 F.2d 1388, 1392 (9th Cir.1986) (internal quotation omitted).
 
 
 80
 We have carefully examined the record, and concluded that with respect to all its arguments regarding the Petroleum Marketing Practices Act, Portland 76 did not establish a genuine issue of material fact.
 
 III. CONCLUSION
 
 81
 We AFFIRM the portion of the judgment awarding $1,000,000 for breach of the lease, VACATE and REVERSE that portion awarding Robinson-Patman Act damages, and AFFIRM the judgment in the other respects challenged. Each party to bear its own costs.